1   KENNETH A. KUWAYTI (CA SBN 145384)
    KKuwayti@mofo.com
2   CHELSEA C. KEHRER (CA SBN 340744)
    CKehrer@mofo.com
3   MORRISON & FOERSTER LLP
    755 Page Mill Road
4   Palo Alto, California 94304-1018
    Telephone: 650.813.5600
5   Facsimile:  650.494.0792

6   RAGESH K. TANGRI (CA SBN 159477)
    RTangri@mofo.com
7   MORRISON & FOERSTER LLP
    425 Market Street
8   San Francisco, CA 94105-2482
    Telephone: 415.268.7000
9   Facsimile:  415.268.7522

10  KYLE W.K. MOONEY (*pro hac vice*)
    KMooney@mofo.com
11  MORRISON & FOERSTER LLP
    250 West 55th Street
12  New York, NY 10019-9601
    Telephone: 212.468.8000
13  Facsimile:  212.468.7900

14  Attorneys for Defendant
    JUMIO CORPORATION

15

16              UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18  FACETEC INC., a Delaware corporation,          Case No. 3:24-cv-3623-RFL

19                      Plaintiff,                 **DEFENDANT JUMIO'S
                                                   OPPOSITION TO PLAINTIFF'S
20          v.                                     MOTION TO DISQUALIFY**

21  JUMIO CORPORATION, a Delaware                  Date:  July 1, 2025
    corporation,                                   Time:  10:00 AM
22                                                 Courtroom:  15
                        Defendant,
23                                                 Judge: Hon. Rita F. Lin
            and                                    Action Filed: June 14, 2025
24
    IPROOV LTD., a United Kingdom limited
25  company,

26                      Defendant-Intervenor.

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

    A.    Morrison Has Represented Jumio in Disputes with FaceTec for More Than
        Four Years .............................................................................................. 2

    B.    Morrison Appeared in This Case Solely to Get an Extension of Time .................. 2

    C.    Morrison Had Only Limited Communications with Perkins After
        Withdrawing from the Case and Before Perkins Was Disqualified ..................... 3

    D.    Perkins Has Not Provided any Work Product to Morrison Since It Was
        Disqualified ........................................................................................... 3

III.  LEGAL STANDARD .......................................................................................... 4

    A.    Motions to Disqualify ............................................................................. 4

    B.    Vicarious Presumption Rule ..................................................................... 5

    C.    Co-Counsel Disqualification ..................................................................... 6

IV.   MOFO SHOULD NOT BE DISQUALIFIED FROM REPRESENTING JUMIO ........... 8

    A.    The Court's Disqualification Order Did Not Address Morrison .......................... 8

    B.    The Law Permits Jumio to Retain Morrison ................................................ 8

        1.    Morrison Was Not Co-Counsel with Perkins .............................................. 9

        2.    The Perkins Litigation Attorneys Did Not Have FaceTec
            Confidential Information ..................................................................... 9

        3.    The Perkins Litigation Attorneys Did Not Disclose Any FaceTec
            Confidential Information to Morrison ..................................................... 9

    C.    Disqualification Would Severely Prejudice Jumio ....................................... 12

V.    PERKINS SHOULD BE PERMITTED TO TRANSFER DOCUMENTS TO
    MORRISON ..................................................................................................... 13

    A.    Courts Permit Transfer of Work Product to Successor Counsel Where the
        Record Confirms There Is No Evidence of Any Taint ................................... 13

    B.    The Court Should Permit Perkins to Transfer Work Product Relating to this
        Litigation to Morrison ........................................................................... 14

VI.   CONCLUSION ................................................................................................. 15

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Actel Corp. v. Quicklogic Corp.*,
   1996 WL 297045 (N.D. Cal. May 29, 1996) ........................................ 14

*Adams v. Aerojet-General Corp.*,
   86 Cal. App. 4th 1324 (2001) .................................................. 6, 12

*Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*,
   913 F. Supp. 2d 900 (2012) (C.D. Cal. 2012) .............................. *passim*

*Andric v. California*,
   55 F. Supp. 2d 1056 (C.D. Cal. 1999) ........................................... 14

*Apple Inc. v. Samsung Elecs. Co.*,
   2011 U.S. Dist. LEXIS 102385 (N.D. Cal. Sept. 12, 2011) ................... 14

*Beltran v. Avon Products, Inc.*,
   867 F. Supp. 2d 1068 (C.D. Cal. 2012) .......................................... 11

*Cal Pak Delivery, Inc. v. UPS, Inc.*
   52 Cal. App. 4th 1 (1997) ...................................................... 14

*City & Cnty. of San Francisco v. Cobra Solutions, Inc.*,
   38 Cal. 4th 839 (2006) .......................................................... 5

*Flatworld Interactives LLC v. Apple Inc.*,
   2013 WL 4039799 (N.D. Cal. Aug. 7, 2013) ................................ *passim*

*Fund of Funds, Ltd v. Arthur Andersen & Co.*,
   567 F.2d 225 (2d Cir. 1977) ..................................................... 11

*Goldberg v. Warner/Chappell Music, Inc.*,
   125 Cal. App. 4th 752 (2005) ................................................. 6, 12

*Guifu Li v. A Perfect Day Franchise, Inc.*,
   2011 WL 4635176 (N.D. Cal. Oct. 5, 2011) ....................................... 7

*In re Airport Car Rental Antitrust Litig.*,
   470 F. Supp. 495 (N.D. Cal. 1979) ...................................... 6, 7, 8, 13

*Kirk v. First Am. Title Ins. Co.*,
   183 Cal App. 4th 776 (2010) ..................................................... 5

*Love v. Permanente Med. Grp.*,
   2013 WL 5273213 (N.D. Cal. Sept. 18, 2013) ................................. 6, 10

*Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*,
 760 F.2d 1045 (9th Cir. 1985) ................................................................................... 5

*Oracle Am. Inc. v. Innovative Tech. Distribs., LLC*,
 2011 WL 2940313 (N.D. Cal. July 20, 2011) ......................................................... 6, 7

*People v. Speedee Oil Change Sys., Inc.*,
 20 Cal. 4th 1135 (1999) ................................................................................... 5, 8, 12

*Pound v. DeMera DeMera Cameron*,
 135 Cal. App. 4th 70 (2005) ............................................................................ 7, 8, 11

*Roberts v. Bisno*,
 2007 Cal. Super. LEXIS 159 (Cnty. Alameda, Super. Court Aug. 31, 2007) ........... 8

*Rosenfeld Constr. Co. v. Super. Court*,
 235 Cal. App. 3d 566 (1991) ...................................................................................... 5

*Union Pac. R.R. Co. v. Hill*,
 2023 WL 7440302 (N.D. Cal. Nov. 8, 2023) ........................................................... 13

*Victaulic Co. v. Am. Home Assurance Co.*,
 80 Cal. App. 5th 485 (2022) ....................................................................................... 5

**Statutes and Other Authorities**

California Rule of Professional Conduct
 1.9 ................................................................................................................................ 5
 1.10 ............................................................................................................................ 12
 1.10(a) .......................................................................................................................... 6
 1.10(b) .......................................................................................................................... 6

Restatement (Third) of the Law Governing Lawyers, § 123 .................................... 5, 6

1

**TABLE OF ABBREVIATIONS**

2

| **Abbreviation** | **Description** |
|---|---|
| "Mem. at __" | Motion to Disqualify Morrison & Foerster LLP as Counsel for Jumio Corporation, dated May 12, 2025 (ECF No. 103) |
| "Disqualification Order" | Order Granting Motion to Disqualify Counsel for Jumio Corporation, dated March 28, 2025 (ECF No. 94) |
| "Kuwayti ¶ __" "Kuwayti Ex. __" | Declaration of Ken Kuwayti in Support of Jumio's Opposition to FaceTec's Motion to Disqualify Morrison & Foerster LLP as Counsel for Jumio Corporation, dated May 27, 2025 |
| "Yap ¶ __" | Declaration of Alex Yap in Support of Jumio's Opposition to FaceTec's Motion to Disqualify Morrison & Foerster LLP as Counsel for Jumio Corporation, dated May 27, 2025 |
| "5/27 Kinsel ¶ __" " | Declaration of Grant Kinsel in Support Jumio's Opposition to FaceTec's Motion to Disqualify Morrison & Foerster LLP as Counsel for Jumio Corporation, dated May 27, 2025 |
| "Morrison" | Morrison & Foerster LLP |
| "Perkins" | Perkins Coie LLP |
| "Perkins Litigation Attorneys" | Attorneys of record for Perkins Coie in this litigation before disqualification, including Grant Kinsel, David Krohn, Jessica Delacenserie, Jessica Kaiser, and Samantha Carl |
| "Arbitration" | *FaceTec, Inc. v. Jumio Corp.*, Case No. 5260000089, Judicial Arbitration and mediation Services, State of Nevada |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2        FaceTec's motion should be denied because Morrison did not receive any FaceTec

3    confidential information and there is no risk that it could have received such information.

4    FaceTec's motion depends on the fundamentally incorrect assertion that the disqualification of

5    one firm raises an "irrebuttable presumption" that its co-counsel must be disqualified.  But courts

6    in this district have repeatedly held that the disqualification of one firm does not automatically

7    compel the disqualification of co-counsel, particularly where, as here, co-counsel had no contact

8    with any lawyer at the disqualified firm who possessed the adversary's confidential information.

9    Instead, the specific facts of each case must be considered.  Here, those facts compel denial of

10    FaceTec's motion.

11        For starters, Morrison never acted as co-counsel with Perkins.  It previously appeared in

12    this action solely to obtain an extension of Jumio's deadline to respond to the Complaint.

13    Morrison withdrew the next court day after Perkins filed the Answer and Counterclaims.  Prior to

14    its withdrawal, Morrison had no communications with Perkins whatsoever, orally or in writing.

15        Following withdrawal, Morrison had only limited communications with Perkins, all

16    written, in which no FaceTec confidential information was exchanged.  This handful of

17    communications involved Morrison providing input to Perkins based on other matters Morrison

18    was handling for Jumio.  And the Perkins Litigation Attorneys could not have even inadvertently

19    disclosed FaceTec confidential information because they did not have access to it.

20        Since Perkins' disqualification, Morrison has been careful not to receive any confidential

21    FaceTec information.  Perkins has not transferred any work product and has not discussed

22    FaceTec confidential information with Morrison.  The two firms were not "co-counsel" during

23    this period either, as FaceTec claims, because the Court had disqualified Perkins.

24        Finally, there is no basis to require Perkins to sequester any work product, let alone

25    documents already filed or exchanged by the parties, including intervenor iProov.  FaceTec's own

26    authority confirms disqualified counsel can transfer work product provided that the evidence

27    establishes it is not tainted with client confidential information.  The unrefuted evidence confirms

28    Perkins' work product is not tainted here.

## II.     BACKGROUND

### A.     Morrison Has Represented Jumio in Disputes with FaceTec for More Than Four Years

Morrison has been representing Jumio in disputes with FaceTec relating to the same technology at issue here for four-and-a-half years.  (Kuwayti ¶¶ 2-16.)  Jumio is a leading provider of online identity verification services.  (*Id.* ¶ 2.)  Jumio previously licensed FaceTec's "liveness authentication" software, which Jumio incorporated into its product.  (*Id.*)  Morrison began representing Jumio in the Fall of 2020 when FaceTec was threatening to cut off Jumio's access to its software, which would have caused Jumio's product to cease operating overnight. (*Id.* ¶¶ 2-3.)  FaceTec did not relent until the last minute, after Jumio filed for a TRO.  (*Id.* ¶ 4.) Unable to trust FaceTec, Jumio transitioned to iProov as its liveness software provider.  (*Id.*)

FaceTec filed an arbitration demand against Jumio relating to the iProov transition and other events, and a patent infringement suit against iProov.  (*Id.* ¶¶ 5-7.)  Morrison represented Jumio in the Arbitration, which proceeded to a seven-day hearing before JAMS starting June 24, 2024.  (*Id.* ¶¶ 7-11.)  The Arbitrator issued an Award denying FaceTec's claims in their entirety, and awarding Jumio $141,024 to compensate it for overpaying FaceTec.  (*Id.* ¶ 14.)  Morrison has continued to represent Jumio in related disputes with FaceTec to the present day.  (*Id.* ¶¶ 2-16.)

### B.     Morrison Appeared in This Case Solely to Get an Extension of Time

FaceTec filed its Complaint in this action on June 14, 2024, and served it on June 18, 2024, six days before the Arbitration hearing.  (ECF Nos. 1, 9.)  Jumio required an extension of time to respond, and authorized Morrison to seek one.  (Kuwayti ¶ 18.)  At a break in the hearing, Mr. Kuwayti asked FaceTec counsel for an extension.  (*Id.*)  Mr. Kuwayti explained that Morrison was representing Jumio for the sole purpose of seeking the extension.  (*Id.*)  FaceTec agreed to the extension, and Mr. Kuwayti filed a stipulation confirming it on July 9, 2024.  (ECF No. 14.)  The only other document Morrison filed in the case was its Notice of Withdrawal (ECF No. 20), one court day after Perkins filed Jumio's Answer and Counterclaims (ECF No. 18).

Morrison was not engaged to represent Jumio on the merits of the case or to be co-counsel with Perkins.  (Kuwayti ¶ 20.)  Prior to withdrawing, Morrison did not have any oral or written

communications with Perkins.  (*Id.*; 5/27 Kinsel ¶ 8.)  It also did not have any communications with Jumio regarding the substance of the FaceTec patents or merits of this case.  (Kuwayti ¶ 20.)

### C.  Morrison Had Only Limited Communications with Perkins After Withdrawing from the Case and Before Perkins Was Disqualified

Between withdrawing from the case and Perkins' disqualification, Morrison had limited communication with Perkins, all by email.  (*Id.* ¶¶ 21-26.)  There were no oral communications.  (*Id.* ¶ 21; 5/27 Kinsel ¶ 9.)  The communications related to this case in only three instances.  (Kuwayti ¶ 22.)  Morrison was asked to, and did, provide input to an excerpt to the Statement of Facts in the Joint Case Management Statement relating to issues in the Arbitration.  (*Id.* ¶ 23.)  Morrison was asked to, and did, provide input concerning one term of Jumio's Preliminary Claim Constructions and Extrinsic Evidence—a term that was also at issue in the Arbitration and is still being disputed in a matter on which Morrison is advising Jumio.  (*Id.* ¶ 24.)  And Morrison was asked to, and did, provide input for an excerpt of an expert declaration concerning that same claim term.  (*Id.* ¶ 25.)[1]  Morrison did not have any oral communications with Jumio relating to the FaceTec patents or merits of this case during this period, and its only written communications with Jumio on these subjects are the same ones described above.  (*Id.* ¶ 26.)

### D.  Perkins Has Not Provided any Work Product to Morrison Since It Was Disqualified

Since Perkins was disqualified, Morrison has deliberately had only limited contact with Perkins and has not received any work product from Perkins.

On April 2, 2025, Mr. Kuwayti and Alex Yap of Morrison had a high-level, introductory call about the case with Gina Signorello, Jumio's General Counsel, and Grant Kinsel of Perkins.  (Kuwayti ¶ 30; Yap ¶ 4.)  Mr. Kinsel confirmed an ethical screen had been erected at the outset of the case and that no members of his team had communications about FaceTec with any Perkins

---

[1] Morrison also had two communications with Perkins during this period pertaining to other matters.  (Kuwayti ¶ 27.)  Jumio forwarded an invoice it received from FaceTec to Morrison and Grant Kinsel of Perkins, who provided a one-line reaction.  (*Id.*)  Morrison also exchanged emails with Perkins relating to a discovery issue in a different patent action, filed by FaceTec against iProov, concerning a document Morrison had provided to iProov three years earlier.  (*Id.*)

1    attorneys who had done prior work for FaceTec.  (Kuwayti ¶ 30; Yap ¶ 4; 5/27 Kinsel ¶ 11.)  Mr.

2    Kinsel also discussed the procedural status of the case and identified categories of work product

3    Perkins possessed without describing their content.  (Kuwayti ¶ 30; Yap ¶ 4; 5/27 Kinsel ¶ 11.)

4        On April 4, 2025, Mr. Yap and Jean Nguyen (also of Morrison) had a similar introductory

5    call regarding Jumio's petitions for *inter partes* review of the FaceTec patents with Ms.

6    Signorello, Mr. Kinsel, and Jessica Kaiser of Perkins.  (Yap ¶ 5; 5/27 Kinsel ¶ 12.)  Mr. Kinsel

7    and Ms. Kaiser did not disclose any information about FaceTec's products or FaceTec's patents

8    other than information appearing on the face of the IPR petitions.  (Yap ¶ 5.)

9        Before each of these two calls, Morrison wrote to Perkins to confirm no information about

10    Perkins' prior representation of FaceTec would be shared.  (Kuwayti ¶ 30; Yap ¶ 5.)  No FaceTec

11    confidential information was disclosed, and the parties did not discuss the subjects called out in

12    the Court's Disqualification Order.  (Kuwayti ¶ 30; Yap ¶¶ 4-5; 5/27 Kinsel ¶¶ 11-12, 16.)

13        Since those calls, Morrison has primarily directed its communications with Perkins to

14    Angela Jones, Perkins' Deputy General Counsel.  (Kuwayti ¶¶ 33-34.)  These were focused on

15    the logistics of Perkins' withdrawal from the IPR proceedings and of obtaining FaceTec approval

16    or guidance from the Court regarding the transfer of documents, obtaining a fact declaration from

17    Ms. Kaiser regarding iProov's lack of involvement with the IPR proceedings, and obtaining the

18    fact declaration from Mr. Kinsel submitted with this opposition.  (*Id.* ¶ 33.)

19        Morrison has also communicated by email with Perkins relating to administrative matters,

20    such as coordinating filings to substitute in as counsel in the IPR proceedings.  It exchanged

21    emails with Ms. Kaiser regarding obtaining an extension of time to file reply briefs in the IPR

22    proceedings, Perkins' withdrawal from the IPRs, and the execution of her declaration; and four

23    emails with Mr. Kinsel regarding Perkins' withdrawal and his requests to FaceTec to allow the

24    transfer of documents. Mr. Kinsel was also copied on some of Ms. Kaiser's emails relating to the

25    IPRs.  (Yap ¶ 7; Kuwayti ¶ 34; 5/27 Kinsel ¶ 14.)

26    **III.    LEGAL STANDARD**

27        **A.    Motions to Disqualify**

28        The "paramount concern" in resolving disqualification motions is to "preserve public trust

1   in the scrupulous administration of justice and the integrity of the bar." *People v. Speedee Oil*

2   *Change Sys., Inc.*, 20 Cal. 4th 1135, 1145 (1999).  At the same time, disqualification motions are

3   susceptible to tactical abuse and can have drastic consequences.  *See id.*; *Victaulic Co. v. Am.*

4   *Home Assurance Co.*, 80 Cal. App. 5th 485, 513 (2022).  They accordingly "should be subjected

5   to particularly strict judicial scrutiny." *Optyl Eyewear Fashion Int'l Corp. v. Style Companies,*

6   *Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985).

7         In resolving disqualification motions, courts look to the California Rules of Professional

8   Conduct for guidance. *Kirk v. First Am. Title Ins. Co.*, 183 Cal App. 4th 776, 792 (2010).

9   California Rule of Professional Conduct 1.9 prohibits an attorney from representing a client

10  against a former client in the same or a substantially related matter to avoid the risk that client

11  confidential information may be used against the former client in a later proceeding.  *Kirk*, 183

12  Cal. App. 4th at 784.  Courts first determine whether the attorney's representation of the former

13  client was "direct and personal" and, if so, whether there is a "substantial relationship" between

14  the subject matter of the two proceedings. *See City & Cnty. of San Francisco v. Cobra Solutions,*

15  *Inc.*, 38 Cal. 4th 839, 847 (2006).  Where the attorney directly and personally represented the

16  client and there is a "substantial relationship," that attorney is presumed to know confidential

17  information and cannot be adverse to their former client.  *See Rosenfeld Constr. Co. v. Super.*

18  *Court*, 235 Cal. App. 3d 566, 574 (1991).

19         **B.      Vicarious Presumption Rule**

20         The courts have developed a body of law addressing the imputation of knowledge of

21  client confidential information from the attorney who personally worked on the prior matter to

22  other attorneys in the same firm who did not. *Kirk*, 183 Cal. App. 4th at 796-802.  This doctrine,

23  the so-called "vicarious presumption rule," is a prophylactic one rooted in pragmatic concerns

24  that attorneys working together at the same firm may share their clients' confidential information.

25  *Kirk*, 183 Cal. App. 4th at 812; *accord* Restatement (Third) of the Law Governing Lawyers,

26  § 123 cmt. a ("Imputation is imposed … primarily as a prophylactic measure").  The California

27  Supreme Court has held the presumption automatically attaches to other attorneys in the same

28  firm but left open whether the presumption was rebuttable.  *Speedee*, 20 Cal. 4th at 1151.

1    The vicarious presumption rule ceases to apply once the attorney who personally worked

2    on the prior matter and the other attorneys who worked with them no longer work at the same

3    firm.  For example, the vicarious presumption does not continue to apply to other attorneys in the

4    firm once the attorney who personally worked on the prior matter has left.  *See Goldberg v.*

5    *Warner/Chappell Music, Inc.*, 125 Cal. App. 4th 752, 765-66 (2005); *see also* California Rule of

6    Professional Conduct 1.10(b).  The vicarious presumption also ceases to apply to attorneys who

7    never worked on the prior matter once they leave the firm at which the attorney who personally

8    did the prior work is employed.  *See Adams v. Aerojet-General Corp.*, 86 Cal. App. 4th 1324,

9    1328 (2001); *see also* California Rule of Professional Conduct 1.10(a).  Accordingly, a theoretical

10   risk that a former client's confidential information might have been shared in the past will not

11   support disqualification; the focus is on the practical risk that such information could be misused

12   in the future as the case proceeds.  *Goldberg*, 125 Cal. App. 4th at 765-66.

### C.    Co-Counsel Disqualification

14   Courts in this district have declined to apply the vicarious presumption rule to co-counsel

15   to a disqualified firm where co-counsel has not communicated with the attorney who personally

16   worked on the prior matter, and the California state courts have not done so.  *See, e.g., Flatworld*

17   *Interactives LLC v. Apple Inc.,* 2013 WL 4039799, at *5 (N.D. Cal. Aug. 7, 2013); *Oracle Am.*

18   *Inc. v. Innovative Tech. Distribs., LLC*, 2011 WL 2940313, at *5 (N.D. Cal. July 20, 2011).

19   Even where co-counsel *has* had contact with the attorney who personally worked on the

20   prior matter, courts in this district hold the "disqualification of one firm does not automatically

21   compel disqualification of the firm's co-counsel."  *In re Airport Car Rental Antitrust Litig.*, 470

22   F. Supp. 495, 501-502 (N.D. Cal. 1979).  *See also Love v. Permanente Med. Grp.*, 2013 WL

23   5273213, at *5 (N.D. Cal. Sept. 18, 2013) (same).  *Accord* Restatement (Third) of the Law

24   Governing Lawyers, § 123, Rptr. Note to cmt. c(iii) ("Courts generally have not imputed the

25   disqualification of a person in one firm to lawyers in another firm, even if members of the two

26   firms are working together, so long as there is only a small actual risk of confidential client

27   information spreading from the primarily conflicted lawyer to the second firm.").

28

1    The rule in this district is that, "[u]nlike the rules regarding automatic disqualification of

2    lawyers within the same firm, 'disqualification of one firm *does not automatically compel*

3    *disqualification* of the firm's co-counsel.  Rather, the *particular facts of each case must be*

4    *considered*. . .'"  *Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 4635176, at *6 (N.D. Cal.

5    Oct. 5, 2011) (emphasis added).  *Accord Oracle*, 2011 WL 2940313, at *5 (citing *In re Airport*,

6    470 F. Supp. at 501-502) ("the particular facts of each case must be considered in order to

7    determine whether disqualification is warranted.").  As Judge Renfrew noted in *In re Airport*, "a

8    rule of automatic disqualification of co-counsel … would not accord sufficient weight to factors

9    counseling against disqualification[:]  the client's right to choose his counsel … the harm to the

10   client caused by an order of disqualification," and the fact "that motions for disqualification are

11   often used for strategic purposes."  *In re Airport*, 470 F. Supp. at 502.

12       In addressing motions to disqualify co-counsel, courts have considered (1) whether the

13   attorney(s) working with co-counsel personally and directly had access to the adverse party's

14   confidential information, (2) whether those attorney(s) disclosed, or should be presumed to have

15   disclosed, confidential information to co-counsel, and (3) the prejudice of disqualifying co-

16   counsel.  *See, e.g.*, *Flatworld*, 2013 WL 3039799, at *9; *Guifu Li*, 2011 WL 4635176, at *6.

17       FaceTec, relying on *Pound v. DeMera DeMera Cameron*, 135 Cal. App. 4th 70 (2005),

18   and *Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F. Supp. 2d 900 (2012)

19   (C.D. Cal. 2012), argues there is an irrebuttable presumption that co-counsel to any disqualified

20   firm must also be disqualified (even if co-counsel had contact only with attorneys to whom a

21   conflict has merely been imputed), and that this district's case-by-case analysis reflects an "out-

22   of-date view of California law" that has not been adopted by the California Supreme Court or any

23   appellate court.  (Mem. at 10.)  FaceTec is wrong.

24       In both *Pound* and *Advanced Messaging,* co-counsel had collaborated directly and

25   materially with the attorney who personally worked on the prior matter.  *Pound* 135 Cal. App. 4th

26   at 78-80; *Advanced Messaging*, 913 F. Supp. 2d at 905.  Neither case confronted a situation

27   where co-counsel to the disqualified firm communicated only with attorneys to whom the conflict

28

1   was imputed, and not the actually tainted attorney.[2]  Indeed, *Flatworld*—a case decided after

2   *Pound* and *Advanced Messaging*—considered both *In re Airport* and *Pound*.  It explained that,

3   while "[c]ourts are divided over whether an attorney or firm that is conflicted due to one

4   representation can also taint that attorney's or firm's co-counsel in a different joint

5   representation," there are no cases that have disqualified co-counsel who had communications

6   with an attorney to whom a conflict was merely imputed, as is the case here.  2013 WL 4039799,

7   at *5 ("***the Court is unaware of any case in which a court disqualified an attorney or law firm***

8   ***when no attorney had actual knowledge or possession of confidential information about an***

9   ***adverse party but one once was conflicted only through imputation***.") (emphasis added).

10      The California Supreme Court cited *In re Airport* in *Speedee*, which concerned

11  disqualification of a firm based on its hiring as "Of Counsel" an attorney who had accessed client

12  confidential information.  20 Cal. 4th at 1156.  The Court could have rejected the case-by-case

13  standard articulated in *In re Airport* but did not.  Instead, it distinguished "Of Counsel" from co-

14  counsel and held the former justified a presumption of conflict, without challenging *In re*

15  *Airport's* conclusion that the latter did not.  *Id.*

16  **IV.    MOFO SHOULD NOT BE DISQUALIFIED FROM REPRESENTING JUMIO**

17      **A.    The Court's Disqualification Order Did Not Address Morrison**

18      FaceTec's motion to disqualify Perkins did not seek to preclude Morrison from serving as

19  successor counsel.  (ECF Nos. 61, 72.)  To the contrary, FaceTec criticized Jumio for not having

20  Morrison litigate the case, arguing Jumio "jump[ed] ship" to Perkins "rather than continue with

21  its long-time counsel, Morrison."  (ECF No. 61 at 14.)  The Court's Disqualification Order does

22  not mention Morrison, let alone suggest that Jumio could not retain Morrison.  (ECF No. 94.)

23      **B.    The Law Permits Jumio to Retain Morrison**

24      Jumio's retention of Morrison does not pose any risk that FaceTec confidential

25  information could be misused.  The Perkins Litigation Attorneys did not have any FaceTec

26  _____

27      [2] FaceTec also relies on *Roberts v. Bisno*, 2007 Cal. Super. LEXIS 159, at *10 (Cnty. Alameda, Super. Court Aug. 31, 2007) (Mem. at 10), but in that case co-counsel had worked and communicated directly with an attorney who had accessed client confidential information, so the

28  court followed *Pound*, which presented a similar fact pattern.

confidential information and did not disclose any FaceTec confidential information to Morrison.

Jumio would be greatly prejudiced if it were denied its choice of Morrison as successor counsel.

### 1. Morrison Was Not Co-Counsel with Perkins

Morrison, before withdrawing from the case, appeared for the sole purpose of obtaining an extension of Jumio's time to respond to the Complaint.  (Kuwayti ¶ 18.)  It did not act as co-counsel with Perkins, did not communicate with Perkins, and did not have any communications with Jumio regarding the substance of the patents or merits of the case.  (*Id.* ¶ 20.)

### 2. The Perkins Litigation Attorneys Did Not Have FaceTec Confidential Information

The unrebutted evidence establishes that the Perkins Litigation Attorneys did not receive or have access to any FaceTec confidential information obtained through Perkins' prior representation of the company.  Perkins implemented an ethical screen at the outset of its involvement in the litigation to prevent any of the Perkins Litigation Attorneys from accessing any FaceTec confidential information that remained in Perkins' possession.  (Kinsel Decl. ¶¶ 6-8 (ECF No. 70-19), Ex. 1 (ECF No. 70-20).)  In addition, the Perkins Litigation Attorneys have each confirmed that they did not access any FaceTec confidential information held by the firm from prior matters or speak to any of the attorneys who worked on those matters about FaceTec. (Carl Decl. ¶ 2 (ECF No. 70-5); Kaiser Decl. ¶ 6 (ECF No. 70-17); Delacenserie Decl. ¶ 2 (ECF No. 70-7); Krohn Decl. ¶ 3 (ECF No. 70-33); Kinsel Del. ¶ 8 (ECF No. 70-19).)  The fact that the Perkins Litigation Attorneys did not have any FaceTec confidential information that could have been shared with Morrison requires denial of FaceTec's motion. *See, e.g., Flatworld*, 2013 WL 3039799, at *7, 8 (denying motion to disqualify co-counsel where conflict was merely imputed to conflicted counsel who did not personally have access to client confidential information).

### 3. The Perkins Litigation Attorneys Did Not Disclose Any FaceTec Confidential Information to Morrison

Even if the Perkins Litigation Attorneys did have any FaceTec confidential information (the evidence establishes they did not), they did not pass any such information on to Morrison. Between its withdrawal from the case and the Court's disqualification of Perkins, Morrison

communicated with Perkins on just three occasions relating to the patent case—and only in writing.  (Kuwayti ¶¶ 21-26.)  Those communications related to Morrison providing input to Perkins based on Morrison's knowledge of Jumio's positions in the Arbitration.  (*Id.*)  The first was to provide input to an excerpt from the statement of facts for the Joint Case Management Conference statement that overlapped with the Arbitration.  (*Id.* ¶ 23.)  The other two were to provide input on documents to be exchanged under the Patent Local Rules relating to claim construction of a term that was also at issue in the Arbitration and a follow-on dispute.  (*Id.* ¶¶ 24, 25.)  By their nature these documents involved citing to the patents, prosecution history, or extrinsic evidence; none involved FaceTec confidential information.  (*Id.* ¶ 26.)  Jumio was part of those communications, but Morrison did not have any other substantive communications with Jumio during this time concerning FaceTec's patents or allegations in this case, either orally or in writing.  (*Id.*)  Because these statements are protected by privilege, they are described in general terms here, but Jumio is amenable to having the Court review the communications *in camera*. This would enable the Court to see the full universe of communications that took place.

After the Court's Disqualification Order, Morrison was retained for the first time to represent Jumio on the merits.  (Kuwayti ¶ 29.)  Morrison was not "co-counsel" with Perkins during this time.  (*Id.* 20.)  The Court's order disqualified Perkins, and did not require Perkins to file a motion to withdraw.  (ECF No. 94 at 14-15.)  Morrison has scrupulously ensured it does not receive FaceTec confidential information.  (Kuwayti ¶¶ 29-34.)  It has not discussed the substance of any Perkins' work product and has not received any work product from Perkins.  (*Id.*)

As a result, even if the Perkins Litigation Attorneys had possessed FaceTec confidential information, Morrison did not receive any of it.  The motion should be denied on that basis as well.  *See Flatworld*, 2013 WL 3039799, at *1, 7 (denying motion to disqualify counsel who had communicated with attorney from disqualified firm because "there is no evidence that he possessed material confidential information about [client] or, for that matter, that he communicated substantively . . . about the litigation such that [counsel] is tainted and should be disqualified."); *see also Love*, 2013 WL 5273213, at *6 (denying motion to disqualify where "there is no evidence that [co-counsel] received any confidential information about [defendant]").

FaceTec's assertion that *Pound* and *Advanced Messaging* "require the disqualification of [Morrison]" (Mem. at 6, 9) is meritless.  In both *Pound* and *Advanced Messaging*, co-counsel was disqualified because they had collaborated with an attorney who personally had access to client confidential information.  *Pound*, 135 Cal. App. 4th at 77; *Advanced Messaging*, 913 F. Supp. 2d at 905.  That is not the case here: none of the Perkins Litigation Attorneys had FaceTec's confidential information, and the limited communications Morrison had with Perkins did not concern FaceTec confidential information—which the Court can confirm for itself.

*Beltran v. Avon Products, Inc.*, 867 F. Supp. 2d 1068 (C.D. Cal. 2012) is the only case cited by FaceTec disqualifying co-counsel based on contact with an attorney to whom a conflict was imputed, not an attorney who personally had access to client confidential information.  But the facts in *Beltran* were materially different.  There, the Avenatti firm, which had fewer than 10 lawyers, was disqualified because one of its partners, while at a prior firm, had billed over 300 hours representing Avon on substantially related issues, and had otherwise had substantial direct contact with the lead partner representing Avon.  Other attorneys at the sub-10-lawyer Avenatti firm and co-counsel at a four-attorney firm had engaged in "extensive" pre-litigation discussions and collaborated on the filing of the Complaint.  *Id.* at 1081, 1084.  The court found that it was "reasonable to assume" that the Avenatti firm and its co-counsel had "engaged in fairly extensive discussions about the case and . . . litigation strategy before filing their complaint and prior to the erection of an wall ethical [sic] segregating [the tainted lawyer] from the case." *Id.* at 1084.  In contrast, here, the evidence shows there was no such communication between Morrison and Perkins, and that Perkins had erected an ethical wall at the outset of the case.[3] *Cf. Flatworld*, 2013 WL 4039799, at *8 ("it does not follow from *Pound* or *Beltran* that disqualification of

---

[3] *Beltran* did not purport to create an irrebuttable presumption that co-counsel who had had contact only with an attorney to whom a conflict was imputed must be disqualified.  Rather, the court did not cite *Pound*, acknowledged there was "no direct California authority" on point, and held disqualification was "warranted under the circumstances of the case." *Id.* at 1084.  In doing so, *Beltran* cited to *Fund of Funds, Ltd v. Arthur Andersen & Co.*, 567 F.2d 225, 233 (2d Cir. 1977) – which itself acknowledged "the generally stated rule that a 'co-counsel' relationship will not alone warrant disqualification" but found the close collaboration between co-counsel and personally tainted counsel in that case warranted disqualification.  *Id.* at 235.  *Beltran*, therefore, is in accord with the law of this district that disqualification of co-counsel is not automatic but rather turns on the particular facts of the case.

1  counsel is necessary for associating with a conflicted attorney who had *no* actual confidential

2  information from the adverse party, as is the case here").

3      Finally, FaceTec's attempt to extend vicarious disqualification to automatically disqualify

4  counsel who have any overlapping appearance or contact with an attorney to whom a conflict is

5  merely imputed ignores the justification for the doctrine: prophylactically guarding against the

6  danger that information is inadvertently shared when attorneys work at the same firm.  In fact,

7  California Rule of Professional Conduct 1.10, issued in 2018, now expressly limits the

8  presumption to attorneys at the same firm only while they remain together at that firm.  *Accord*

9  *Adams v. Aerojet,* 86 Cal. App. 4th at 1328 (no disqualification of attorney to whom conflict had

10 been imputed after he left firm at which personally conflicted attorneys worked); *Goldberg*, 125

11 Cal. App. 4th at 765 (no disqualification of firm where personally conflicted attorney leaves firm

12 and only attorneys to whom conflict had been imputed remain).

13     **C.    Disqualification Would Severely Prejudice Jumio**

14     Courts considering disqualification motions may also consider "a client's right to chosen

15 counsel, an attorney's interest in representing the client, the financial burden on a client to replace

16 disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion."

17 *Speedee*, 20 Cal. 4th at 1145.  Jumio's longest-serving counsel, Perkins, has already been

18 disqualified.  Disqualifying Jumio's other counsel, Morrison, would even further prejudice Jumio.

19     Morrison has represented Jumio for four-and-a-half years in disputes with FaceTec

20 relating to the same "liveness authentication" technologies at issue here, including Morrison's

21 successful representation against FaceTec through judgment in the Arbitration—which, in several

22 respects, overlaps with issues and work required in this case.  (Kuwayti ¶ 9.)  FaceTec's claims in

23 the Arbitration and this case relate to "liveness authentication" technology, and Jumio's decision

24 to use iProov's technology in place of FaceTec's.  (*Id*.)  FaceTec expressly refers in its Complaint

25 to the breach of contract litigated in the Arbitration.  (Compl. ¶¶ 30-32, ECF No. 1.)  Much of

26 Morrison's work for the Arbitration is relevant to this action, including diligence regarding the

27 implicated technology (*e.g.*, operation, marketing, finances), as well as interviews and close

28 collaboration with Jumio's key engineers, product manager, controller, and other Jumio

1   employees.  (Kuwayti ¶ 9.)  Morrison also deposed and cross-examined the two main FaceTec

2   witnesses whose testimony will be critical to this case, FaceTec's CEO Kevin Tussy (named

3   inventor on all four patents) and CTO, Josh Rose.  (*Id.* ¶ 10.)  Morrison attorneys have billed over

4   3,000 hours to Jumio on disputes with FaceTec over the past four-and-a-half years. (*Id.* ¶ 16.)

5   Jumio will be deprived of the benefit of having counsel with all of this accumulated knowledge if

6   Jumio is denied its choice of successor counsel.  The prejudice will be heightened because

7   FaceTec's counsel here, One LLP, also represented FaceTec at the Arbitration hearing.  (*Id.* ¶ 12.)

8          This substantial prejudice weighs strongly against disqualification.  *See, e.g.*, *In re*

9   *Airport*, 470 F. Supp. At 502-503 (emphasizing court should consider "client's right to choose his

10   counsel and the harm to the client caused by an order of disqualification"); *cf. Union Pac. R.R.*

11   *Co. v. Hill,* 2023 WL 7440302, at *11-16 (N.D. Cal. Nov. 8, 2023) (denying motion to disqualify

12   firm based on substantially related work performed by former partner where evidence did not

13   demonstrate confidential information was "actually exchanged" with other attorneys and party

14   "would face substantial prejudice" from disqualification).

15   **V.    PERKINS SHOULD BE PERMITTED TO TRANSFER DOCUMENTS**
16   **       TO MORRISON**

17          FaceTec's motion to disqualify Perkins did not request that Perkins be prohibited from

18   transferring any "non-public" or "confidential" work product to new counsel[4], and its belated

19   request for that relief should be denied.  Courts routinely allow the transfer of documents to new

20   counsel where, as here, there is no risk they are tainted with client confidential information.

21          **A.    Courts Permit Transfer of Work Product to Successor Counsel Where the**
22          **        Record Confirms There Is No Evidence of Any Taint**

23          Courts in this district refuse to apply a *per se* rule prohibiting the transfer of work product

24   from disqualified counsel to successor counsel because, *inter alia*, such a drastic remedy

25   "provide[s] no benefit to the complaining party other than the satisfaction of imposing an

26   _____

27          [4] Because FaceTec subsequently objected to Perkins transferring its work product to
     Morrison, Jumio filed a request for a status conference to alert the Court to this issue and get
28   guidance as to how the Court believed it should be resolved.  (*See* Kuwayti ¶¶ 35-45.)

1  unnecessary financial burden on its opponent[.]" *Actel Corp. v. Quicklogic Corp.*, 1996 WL

2  297045, at *12 (N.D. Cal. May 29, 1996) (citation omitted).  Rather, courts allow the transfer of

3  work product provided the record evidence establishes it is not tainted with the client confidential

4  information that required disqualification.  *See Apple Inc. v. Samsung Elecs. Co.*, 2011 U.S. Dist.

5  LEXIS 102385, at *8 (N.D. Cal. Sept. 12, 2011) (allowing transfer of work product where

6  attorneys who previously worked on Samsung matters represented they never disclosed Samsung

7  confidential information to litigation team or client); *Andric v. California*, 55 F. Supp. 2d 1056,

8  1069 (C.D. Cal. 1999) (allowing transfer of work product because "there is no evidence in the

9  record that [disqualified counsel themselves] obtained confidential information"); *Cal Pak*

10 *Delivery, Inc. v. UPS, Inc.* 52 Cal. App. 4th 1, 17-18 (1997) (refusing to prohibit transfer of work

11 product from disqualified firm to successor counsel absent evidence that prohibition was needed

12 to remedy "improper advantage").

13        This is consistent with the line drawn in *Advanced Messaging*, the only case FaceTec cites

14 to support its request to bar the transfer of documents.  In *Advanced Messaging*, the court

15 permitted transfer of (1) "all documents produced by either party in this action and all pleadings

16 either filed with the court or exchanged [with opposing counsel]," and (2) any other documents

17 accompanied by a declaration that the attorney who actually had access to client's confidential

18 information from a past case "did not provide, directly or indirectly, any information contained

19 within the non-public documents." *Advanced Messaging*, 913 F. Supp. 2d at 913.

20        **B.    The Court Should Permit Perkins to Transfer Work Product Relating
21              to this Litigation to Morrison**

22        Perkins should be able to transfer all documents related to this litigation (which obviously

23 does not include any materials from its prior representation of FaceTec) because the unrebutted

24 evidence established that none of that work product could include any of the FaceTec confidential

25 information that led to disqualification.  The Perkins Litigation Attorneys did not previously work

26 on FaceTec matters and did not have access to any FaceTec confidential information from those

27 matters.  (*See supra* Part IV.B.2.)  Accordingly, there should be no restriction on Perkins' transfer

28 of documents.  *See Andric*, 55 F. Supp. 2d at 1069; *Apple*, 2011 U.S. Dist. LEXIS 102385, at *8.

1   Perkins could presumably supplement the record with a more specific declaration addressing the

2   transferred files, as in *Advanced Messaging* (913 F. Supp. 2d at 913), should the Court prefer.

3          At a minimum, the Court should allow Perkins to transfer anything already filed or

4   exchanged by the parties, including filings in this action and in the IPRs, as well as

5   communications between the parties, such as discovery, claim construction disclosures under the

6   Patent Local Rules,[5] and any document productions.  There is no justification for requiring

7   Perkins to withhold filings or documents already exchanged between all the parties, including

8   *intervenor iProov*.[6]  Moreover, FaceTec could have sought to stay discovery pending resolution

9   of its disqualification motion but did not.  Indeed, FaceTec opposed a stay sought on other

10  grounds and never mentioned in its filings that it believed proceeding with discovery under the

11  Patent Local Rules risked disclosing its confidential information.  (*See* Kuwayti ¶ 37, ECF Nos.

12  61, 62, 91.)  FaceTec should not now be able to force Jumio to redo this work at a cost of

13  hundreds of thousands of dollars.  If this work product were sequestered, Jumio would also be

14  placed in the highly prejudicial position where the other parties in the case have the benefit of the

15  work product that was already exchanged but only Jumio cannot access it.

16  **VI.    CONCLUSION**

17         For all the above reasons, FaceTec's motion should be denied, and Perkins should be

18  permitted to transfer documents relating to this litigation to Morrison.

19

20

21         [5] The invalidity contentions, proposed claim terms, and preliminary claim construction

22  statements were shared between Jumio, FaceTec, and iProov.  The Court stayed the case on
    February 25, the date the joint claim construction statements were due.  (5/27 Kinsel ¶ 5.)

23         [6] FaceTec's contention that statements by Perkins and the Court preclude Perkins' transfer

24  of documents is unavailing.  Mr. Kinsel, addressing the Court's inquiry about considering IPR
    work in connection with prejudice, argued that if the IPRs were not instituted and Perkins were
    disqualified then Perkins' work in connection with those IPRs would be lost.  (2/11/25 Hrg. Tr. at

25  44:11-18 (Kuwayti Ex. 5).)  FaceTec's counsel argued against that position and stated that
    Perkins' work product, including IPR petitions and infringement contentions that were "on file,"

26  would not be lost.  (*Id.* at 47:19-49:1.)  The Court, also addressing IPR work, noted only that
    successor counsel "wouldn't have all of the other background that maybe Perkins has developed

27  that is not reflected in the final work product."  (*Id.* at 48:21-24.)  None of these statements
    requires that successor counsel be precluded from accessing any of Perkins' attorneys final

28  written work product.

1    Dated: May 27, 2025                    Respectfully submitted,

2                                            MORRISON & FOERSTER LLP

3
                                            By:   /s/ Ragesh K. Tangri
4                                                 Ragesh K. Tangri

5                                            Attorneys for Defendant
                                            JUMIO CORPORATION
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28