KENNETH A. KUWAYTI (CA SBN 145384)
KKuwayti@mofo.com
CHELSEA KEHRER (CA SBN 340744)
CKehrer@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile:  650.494.0792

RAGESH K. TANGRI (CA SBN 159477)
RTangri@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.268.7000
Facsimile:  415.268.7522

KYLE W.K. MOONEY (*pro hac vice*)
KMooney@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.468.8000
Facsimile:  212.468.7900

Attorneys for Defendant
JUMIO CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACETEC INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>JUMIO CORPORATION, a Delaware corporation,<br><br>Defendant,<br><br>and<br><br>IPROOV LTD., a United Kingdom limited company,<br><br>Defendant-Intervenor. | Case No. 3:24-cv-3623-RFL<br><br>**DECLARATION OF KENNETH A. KUWAYTI IN SUPPORT OF OPPOSITION TO FACETEC MOTION TO DISQUALIFY**<br><br>Date:  July 1, 2025<br>Time:  10:00 AM<br>Courtroom:  15<br><br>Judge: Hon. Rita F. Lin<br>Action Filed: June 14, 2025 |

I, Kenneth A. Kuwayti, declare:

1.  I am a partner at the law firm of Morrison & Foerster LLP ("Morrison"). I make this declaration based on my own personal knowledge. If called as a witness, I could and would competently testify to the facts set forth herein.

**Morrison Has Been Representing Jumio Since The Fall of 2020**

2.  Morrison first started representing Jumio in the Fall of 2020 in connection with a commercial dispute between Jumio and FaceTec. Jumio is a leading provider of online identity verification services. FaceTec was Jumio's "liveness authentication" software vendor at the time. FaceTec's liveness authentication software was embedded into the online identity verification software that Jumio provided to customers.

3.  At the time that Morrison was hired, FaceTec had alleged that Jumio was breaching the Services Agreement between FaceTec and Jumio. FaceTec was threatening to withhold the updated licensing keys that Jumio required to continue using FaceTec's software. Jumio was concerned that FaceTec's refusal to provide the licensing keys would cause Jumio's software—which is incorporated directly into its customers' software and websites—to fail overnight, stranding Jumio's customers without an identity verification solution to onboard new users and verify existing ones.

4.  I exchanged correspondence with FaceTec CEO Kevin Tussy and had further correspondence and telephone calls with FaceTec's outside counsel at the time, Terry Coffing, to try to avert this crisis. Our firm prepared and filed a motion for a temporary restraining order ("TRO") in Santa Clara County Superior Court in November 2020, along with substantial supporting declarations and documentation, seeking to prevent FaceTec from withholding the licensing keys. Because of COVID the courthouse was essentially closed at that time to outside personnel. We filed the TRO papers electronically, but the court was short-staffed. It was impossible to reach anyone even by phone, and the papers were never picked up by the clerk. As a result, on December 2, 2020, we filed an arbitration demand before JAMS in Las Vegas, Nevada, with a request for emergency relief. On December 3, 2020, FaceTec finally provided the updated licensing keys to Jumio—just one day before the December 4, 2020, date Jumio had told

1  FaceTec would be the last day it could get the key in time to update the software and verify that it
2  was working in order to avoid a disruption of service. Once FaceTec provided the key, Jumio
3  withdrew the arbitration demand and the TRO motion, which still had never been picked up or
4  filed by the clerk in Santa Clara County Superior Court. As a result of this experience, Jumio
5  ultimately transitioned to another liveness authentication software provider, iProov.

6      5.    That did not resolve the disputes between FaceTec and Jumio, however. The
7  parties continued to have friction over their relationship, and I advised Jumio on various issues
8  during this time. Mr. Coffing sent Jumio a formal Notice of Breach on FaceTec's behalf in
9  September 2021 alleging multiple breaches of the parties' Services Agreement. A separate
10 attorney, Chad Miller of Weide & Miller, sent a letter to Jumio at that same time, alleging that, by
11 incorporating iProov's software, Jumio had misappropriated FaceTec's intellectual property and
12 was infringing one of the patents at issue in this proceeding, U.S. Patent No. 10,776,471 (the
13 "'471 Patent"). I responded to both of these letters on Jumio's behalf and had follow-up
14 correspondence with Mr. Coffing.

15     6.    On December 28, 2021, FaceTec filed a patent infringement suit in the District of
16 Nevada against iProov. FaceTec did not file a suit against Jumio for patent infringement (or
17 misappropriation of intellectual property) at that time.

18     **Morrison Represents Jumio In An Arbitration With FaceTec**

19     7.    On June 2, 2022, FaceTec filed an arbitration demand against Jumio and Morrison
20 represented Jumio in that arbitration (the "Arbitration"). FaceTec alleged multiple breaches of
21 contract, many of which had been raised in FaceTec's September 2021 Notice of Breach. These
22 claims included, among others, claims that Jumio failed to exercise "commercially reasonable
23 efforts to promote" FaceTec after it switched to iProov, that Jumio failed to fully pay FaceTec for
24 the services Jumio used as required by the Services Agreement, and that Jumio failed to upgrade
25 FaceTec's liveness software as it was obligated to do.

26     8.    Jumio filed a response and alleged counterclaims against FaceTec for breach of
27 contract, seeking to recover, among other things, the additional costs it incurred in having to
28 rapidly switch to iProov for liveness services after FaceTec threatened to cut off access to its

liveness software, and alleging that FaceTec had breached the provision of the Services Agreement providing that it "shall not materially degrade the performance, features or the functionality" of the software.

9. Many of the issues in the Arbitration and this case overlap. The FaceTec liveness authentication technology at issue in this case was also at issue in the Arbitration, as both parties had claims in the Arbitration relating to that technology and its performance, which was the subject of extensive testimony and document discovery. The issue of Jumio's transition to, and incorporation of, iProov's liveness software was also front and center in the Arbitration. During the course of the Arbitration, Morrison became very familiar with Jumio's identification verification technology and many aspects of FaceTec's liveness technology. We worked very closely with Jumio's lead engineers and project manager to learn about the technology and how best to present it and with others at the company, including the controller and marketing personnel, to gather information about Jumio's finances and marketing practices.

10. In addition, during discovery in the Arbitration, Morrison twice deposed Kevin Tussy, FaceTec's CEO and the sole named inventor on all four patent applications, once in his personal capacity and once as a corporate representative. Morrison also deposed FaceTec's CTO, Josh Rose.

11. After two years the Arbitration proceeded to a week-long in-person evidentiary hearing at JAMS in Las Vegas from June 24-28, 2024. The hearing continued into July with remote testimony on July 3 and July 9, 2024. Ten fact and expert witnesses testified at the hearing, including Mr. Tussy and Mr. Rose.

12. Lead counsel for FaceTec in the Arbitration was Frank Flansburg III, of Brownstein Hyatt Farber Schrek, LLP. However, Matthew McKissick, Nate Dilger, and William O'Brien of One LLP—the firm representing FaceTec in this action—filed a notice of appearance in the Arbitration on June 19, 2024. I believe that at least two of the One LLP partners were at JAMS in Las Vegas for the full week of the in-person arbitration hearing.

13. The parties simultaneously exchanged opening post-hearing briefs on August 7, 2024, and closing post-hearing briefs on August 21, 2024. The briefs were lengthy – both of

1  Jumio's briefs were over 80 pages.  FaceTec's closing brief was 110 pages.  Morrison also
2  submitted an additional letter brief on Jumio's behalf on August 27, 2024, addressing some
3  exhibits that we believed FaceTec had improperly filed with its closing brief.

4        14.     The Arbitrator, retired D. Nev. Judge Philip Pro, issued the Arbitration Award on
5  October 15, 2024.  The Award denied FaceTec's claims in their entirety.  It also denied Jumio's
6  counterclaims, but awarded Jumio $141,024, finding that Jumio had overpaid FaceTec for the
7  services it had received.

8        15.     After the Arbitration Award, Morrison contacted FaceTec's counsel, Mr.
9  Flansburg, to let him know that Jumio intended to file a petition to confirm the Award.  The
10 parties disputed how much of the award could be placed in the public record.  Before we could
11 file our petition, FaceTec, represented by Mr. Dilger, Mr. O'Brien, and Taylor Foss of One LLP,
12 filed a petition to confirm the Award on November 7, 2024, in Santa Clara County Superior
13 Court, attaching a heavily redacted version of the Award.  The parties had several months of
14 discussions and briefing relating to the appropriate sealing of portions of the Award and other
15 filings in the Superior Court action.  Mr. Dilger represented FaceTec at the hearing on the sealing
16 issues and the petition to confirm the Award on January 24, 2025, at which the Court directed the
17 parties to further meet and confer.  Ultimately, after this additional meet and confer, FaceTec
18 agreed to file a lightly redacted version of the Award.  A true and correct copy of this redacted
19 version of the Award, which was filed in the public record by agreement of the parties, is attached
20 to this declaration as Exhibit 1.  The court entered an order confirming the Arbitration Award on
21 March 11, 2025.

22        16.     Morrison has continued to represent Jumio in other disputes with FaceTec even
23 after the Arbitration concluded.  On November 12, 2024, FaceTec sent Jumio an invoice claiming
24 that Jumio owed FaceTec money for the alleged retention of "biometric data" after the parties'
25 Services Agreement concluded in October of 2021.  This was a claim that FaceTec had raised in
26 the Arbitration and that is addressed in the Arbitration Award, which found that "FaceTec has
27 failed to meet the threshold of showing of a cognizable biometrics claim[.]".  *See* Exhibit 1 at 30.
28 Then, on December 17, 2024, FaceTec sent Jumio a Notice of Disputes claiming that Jumio had

breached the Services Agreement by not paying the November 12, 2024 invoice within 30 days, and had breached other sections of the Agreement as well. FaceTec has continued to send monthly invoices to Jumio regarding the alleged retention of biometric data since that time. We have been advising Jumio with regards to these issues. In total, Morrison has billed over 3,000 hours to Jumio on disputes with FaceTec (not including any work on this action) over the past four-and-a-half years.

**Morrison Appeared In This Action Solely To Obtain An Extension For Jumio**

17. FaceTec filed the Complaint in this action against Jumio on June 14, 2024. Jumio was served with the Complaint in this action on June 18, 2024—six days before the Arbitration hearing in Las Vegas began.

18. It was obvious that, with its legal and executive team about to be fully occupied with an arbitration, Jumio was going to require an extension of time to respond to FaceTec's Complaint. At a break in the Arbitration hearing, in the kitchen of the JAMS Las Vegas facility, I asked Nate Dilger if FaceTec would agree to a 45-day extension of time. I told him that Morrison was representing Jumio for the sole purpose of obtaining the extension of time. That was all I had been authorized to do. FaceTec agreed to the extension and, after some follow up email correspondence with Mr. Dilger regarding the extension (*see* ECF No. 103-2), I subsequently filed a stipulation with the Court for the extension, with Mr. Dilger's approval, on July 9, 2024— which was also the last date of Arbitration testimony (ECF No. 14).

19. Two days after that, on July 11, 2024, Jumio informed me that it was retaining Perkins, not Morrison, to represent Jumio in this action. On August 23, 2024, Perkins filed Jumio's Answer and Counterclaims. The next court day, Monday, August 26, 2024, we filed Morrison's Notice of Withdrawal, the only other document that we filed with the Court during this period. (ECF No. 20.)

20. We were never engaged by Jumio to represent it on the merits of the patent case until after Perkins was disqualified from this action. We were never engaged by Jumio to be co-counsel with Perkins or anyone else. We did not have any oral or written communications with Perkins at all prior to filing our notice of withdrawal. We also did not have any substantive oral

or written communications with Jumio about the patents or the patent case during this time. We were never included on the caption page of anything that Perkins filed and would not have expected to be.

**Morrison Had Limited Communications With Perkins After Withdrawing From The Case And Before Perkins Was Disqualified**

21. After withdrawing from the case in August of 2024, and before Perkins was disqualified in March of 2025, we had only a small number of communications with Perkins. We again did not have any oral communications with anyone from Perkins during this time.

22. In three instances these emails related to this case. In each case we were asked to provide our input, shortly before a document was to be filed or exchanged with FaceTec, on issues that were the same as, or closely related to, issues that were also present in the matters that Morrison was handling for Jumio. None of these communications involved any FaceTec confidential information.

23. First, on September 11, 2024, we were asked to provide input, and did, to an excerpt from the statement of facts to the Joint Case Management Statement that related to the Arbitration in which we were counsel for Jumio.

24. Second, on February 5, 2025, we were asked to provide input, and did, concerning one term of Jumio's Preliminary Claim Constructions and Extrinsic Evidence that were to be exchanged with FaceTec pursuant to Patent Local Rule 4-2. This term was also at issue in the Arbitration.

25. Lastly, on February 24, 2025, we were asked to provide input, and did, into an excerpt of an expert declaration concerning that same term, which Jumio expected to submit in support of the Joint Claim Construction Statement that would be filed with the Court in accordance with Patent Local Rule 4-3.

26. The three written communications described above were also the only substantive communications that Morrison had with Jumio relating to this case during this time period. During this time period we did not have any oral communications with Jumio at all relating to the FaceTec patents or the merits of this case.

27. We had two other communications with Perkins during this time period pertaining to other matters. The first, on November 12, 2024, concerned the invoice that FaceTec had issued to Jumio that day—a matter on which Morrison has been advising Jumio as stated above. Grant Kinsel of Perkins gave a one-line response. The second, on February 5, 2025, concerned a communication from counsel for iProov relating to a discovery issue in the District of Nevada patent action between FaceTec and iProov; that issue in turn related to communications between Morrison and iProov's counsel in 2021.

28. Because the only communications that Morrison had with Perkins during this time were by email, the Court can review the entirety of the communications that took place by reviewing the emails *in camera*.

**Morrison Has Not Received Any Perkins Work Product Since Perkins Was Disqualified**

29. After the Court's disqualification of Perkins, Morrison was retained for the first time to represent Jumio on the merits of this case. Morrison has had limited contacts with Perkins since Perkins was disqualified and Morrison was retained to represent Jumio in this case and has not received any work product from Perkins. We have not even received any documents that were produced by FaceTec in this case.

30. On April 2, 2025, I had a high-level, introductory call about this case with Gina Signorello, Jumio's General Counsel, and Grant Kinsel from Perkins. My partner, Alex Yap, who is leading the IPR proceedings challenging the FaceTec patents, also joined the call. Prior to the call I wrote to make certain that no information about Perkins' prior representation would be shared. During the call itself, Mr. Kinsel confirmed that--consistent with statements in declarations submitted by Perkins' attorneys in opposition to FaceTec's motion to disqualify Perkins—an ethical screen had been put in place at the outset of the case and that no members of his team had had communications about FaceTec with anybody who had done prior work for FaceTec. Mr. Kinsel described the procedural status of this case and IPR proceedings and identified general categories of work product that Perkins possessed—such as Invalidity Contentions that had been exchanged in accordance with the Patent Local Rules, but not filed

1   with the Court—without describing their content, at my request.  We did not discuss any

2   information about FaceTec's products, obviousness of the patents, commercial success of

3   FaceTec's products, or other secondary considerations of non-obviousness.  I was careful to

4   ensure that no FaceTec confidential information would be disclosed during this call and I do not

5   believe that any was.

6         31.     I am informed and understand that Alex Yap and Jean Nguyen, Of Counsel, who is

7   assisting him with the IPR proceedings, had an introductory call on April 4, 2025, with Ms.

8   Signorello, Mr. Kinsel, and Jessica Kaiser of Perkins, to discuss the IPR proceedings.  I did not

9   participate in that call.  Mr. Yap describes the call in a declaration that he is submitting in

10  opposition to FaceTec's motion to disqualify.

11        32.     The evening of April 4, 2025, Ms. Signorello forwarded an email to me that she

12  had received from FaceTec's Chief Legal Officer, Trevor Chaplick shortly after 6:00 p.m.,

13  several hours after Mr. Yap's call had concluded, warning Jumio against Perkins coordinating

14  with, or supplying documents or work product to Jumio's successor counsel.  Perkins has not

15  delivered to Morrison any documents to transition the case, including Invalidity Contentions,

16  which Morrison has never viewed.  Given FaceTec's position we have not wanted to receive any

17  work product from FaceTec without the approval of FaceTec or the Court.

18        33.     Morrison has communicated since that time primarily with Angela Jones, who I

19  understand to be the Deputy General Counsel of Perkins and not somebody who worked

20  substantively on litigating this action or the IPR proceedings (other than in connection with

21  FaceTec's disqualification motion).  Those communications have been focused on the logistics of

22  Perkins' withdrawal from the IPR proceedings and obtaining FaceTec approval or guidance from

23  the Court regarding the transfer of documents from Perkins to Morrison, obtaining a fact

24  declaration from Ms. Kaiser regarding iProov's lack of involvement in the IPR proceedings (an

25  essentially identical version of which was submitted in each of the four proceedings), and

26  obtaining the fact declaration from Mr. Kinsel submitted with this opposition.  A true and correct

27  copy of the Kaiser declaration that was submitted in support of the IPR proceeding relating to the

28  '471 Patent is attached to this declaration as Exhibit 2  None of those communications concerned

the underlying substance of this action or the IPR proceedings. I do not believe that any FaceTec confidential information was disclosed during any of those communications.

34. Morrison has also had communications by email with Perkins relating to administrative matters, such as coordinating filings to substitute in as counsel in the IPR proceedings. This included emails with Ms. Kaiser regarding obtaining an extension of time for filing reply briefs in the IPR proceedings, withdrawal from the IPR, and the execution of her declaration. I also received four email communications from Grant Kinsel regarding Perkins' withdrawal from the IPR proceedings and Perkins' request to FaceTec to transfer documents. Mr. Kinsel was copied on some of the emails we received from Ms. Kaiser relating to the IPR proceedings.

**Request for Status Conference**

35. Because FaceTec has argued that it was somehow improper for Morrison to file an administrative motion requesting a status conference (ECF No. 101 at 4-5), I address that issue below.

36. FaceTec had stated in very clear terms that Perkins was not to transfer any files to Jumio's new counsel, including the Invalidity Contentions that the parties had already exchanged, or even publicly filed pleadings and correspondence between counsel. (*See, e.g.,* ECF Nos. 103-5 and 103-6, Dilger Decl. Exs. D-E.)

37. FaceTec insisted on this despite that it had not asked the Court to stay discovery and disclosure under the Patent Local Rules when it filed its motion for disqualification. (ECF No. 61.) Instead, the opposition that FaceTec filed to Jumio's Motion to Stay Pending IPRs shows that it opposed the stay Jumio was seeking in part because it was filing a motion for disqualification. (*See* ECF No. 62 at 6.) Even when FaceTec filed a motion for a 30-day continuance on February 24, 2025, the day before the deadline for filing Joint Claim Construction Statements, it did not list the potential harm of the disclosure of its confidential information as a reason for seeking the stay. Instead, it pointed to the inefficiency and harm of going forward with claim construction statements and briefing "while the scope and/or substance of the claim construction issues remain unclear," which might cause "the parties to incur the expense related

to potentially preparing claim construction items that would no longer be at issue." (ECF No. 91 at 3.)

38. FaceTec's refusal to allow Perkins to transfer any documents stopped our ability to try to get up to speed on the case in its tracks, because we did not know how much work we would have to do. We did not know, for example, whether we would be required to start the Invalidity Contentions from scratch with our own prior art search or whether we would be utilizing the Invalidity Contentions that Perkins had prepared that Jumio had already exchanged with FaceTec and iProov. We believed that the best path forward would be to request a status conference to alert the Court to this issue and get guidance on how the Court believed it should be resolved. We tried to meet and confer with FaceTec over the issue and filed the administrative motion after we were unable to get them to respond promptly.

39. Specifically, on Monday April 28, 2025, at 12:03 p.m., I contacted counsel for FaceTec and iProov by email to propose that the parties file a joint stipulation requesting a status conference to discuss the following issues: (1) the extent to which Perkins may transfer documents to Morrison; (2) the motions that the Court dismissed without prejudice at the time of Perkins' disqualification; and (3) the submission of a revised joint proposed schedule for the case. I offered in the email to meet and confer that day or on Tuesday, April 29, 2025. (*See* ECF No. 99-1 at 4.) iProov agreed to proceed by joint stipulation. FaceTec did not respond.

40. On April 29, 2025, at 8:19 p.m., I sent a follow-up email to FaceTec counsel. I again did not hear back. On April 30, 2025, I called FaceTec counsel (Nate Dilger) and left a voicemail. I also sent another email to FaceTec counsel on April 30, 2025, at 3:05 p.m. FaceTec counsel then responded that he had relayed our request to his client, but they had not been able to speak, and that he would respond once he had clarity on the issue. *See id.* at 3.

41. On April 30, 2025, at 4:25 p.m., I followed up by email with FaceTec counsel, indicated that Jumio had wanted to file a request for status conference with the Court the same day that Morrison filed its notice of appearance, but would wait until noon the following day, May 1, to give FaceTec further opportunity to consider the issue. *See id*. But on May 1 we again did not hear anything from FaceTec, so we filed our motion at approximately 4:33 p.m.

42. We did not know when we filed our motion that FaceTec intended to file a motion to disqualify. On April 11, FaceTec's CLO Trevor Chaplick had sent Jumio an email stating that FaceTec objected to Morrison's representation of Jumio "because you and your firm were co-counsel of record along with Perkins Coie on behalf of Jumio in this case," and there was a "significant period of overlap of up to nearly a month and a half." A true and correct copy of that email is attached to this declaration as Exhibit 3.

43. Jumio sent a detailed response to that email on April 22. A true and correct copy of that letter is attached to this declaration as Exhibit 4. The April 22 response addressed FaceTec's objection to our appearance made in the April 11 email based on our role as "prior 'counsel of record'" in this litigation. *See id.* at 1. It explained that, as Jumio had told FaceTec in June of 2024, and as described in more detail above, Morrison had only represented Jumio for the purpose of securing an extension of time for Jumio to respond to the complaint. *Id.* at 1. It further explained that Morrison was never engaged as counsel to defend the merits of the case, never acted as co-counsel with Perkins, and never had a single oral or written communication with Perkins prior to withdrawing the day after Perkins filed Jumio's Answer and Counterclaims in the case, during the "'significant period of overlap of up to nearly a month and a half'" asserted by FaceTec. *Id.* at 2. We additionally pointed Perkins to authority from this District which Mr. Chaplick's letter did not address, rejecting the notion of automatic disqualification of co-counsel. *See id.* We concluded the letter by stating that FaceTec could "call if you wish to discuss this further." *Id.* at 3.

44. In the ensuing two weeks Jumio never heard back from FaceTec. FaceTec did not raise disqualification when Jumio sent its April 28 email providing notice that it would be appearing in this case and asking for a status conference. *See* ECF No. 99-1, Ex. 1. When FaceTec's counsel responded to the email on April 30 requesting its position on the status conference he also did not raise disqualification, but stated only that he had "relayed" the request to his client and would respond once he had "clarity on the issue." *See id.* at 1-2. Even on May 5, when FaceTec requested an extension and Jumio asked FaceTec to state its position on the status conference request, FaceTec did not mention disqualification.

45. A true and correct copy of excerpts from the transcript that our firm received from the court reporter for the February 11, 2025 hearing on FaceTec's motion to disqualify Perkins is attached to this declaration as Exhibit 5.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of May, 2025 in Palo Alto, California.

　　　　　　　　　　　　　　　　　　　　*/s/ Kenneth A. Kuwayti*
　　　　　　　　　　　　　　　　　　　　Kenneth A. Kuwayti

**ATTESTATION OF E-FILED SIGNATURE**

I, Ragesh K. Tangri, am the ECF User whose ID and password are being used to file this Declaration. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that Kenneth A. Kuwayti has concurred in this filing.

Dated: May 27, 2025

　　　　　　　　　　　　　　　　　　　　*/s/ Ragesh K. Tangri*
　　　　　　　　　　　　　　　　　　　　Ragesh K. Tangri