# EXHIBIT 1

**JAMS ARBITRATION CASE REFERENCE NO. 5260000089**

| | | |
|---|---|---|
| **FaceTec, Inc.**<br>    **Claimant** | ) ) ) ) ) | |
| **And** | ) ) ) ) | **AWARD** |
| **Jumio, Corp.**<br>    **Respondent.** | ) ) ) ) ) | |

## INTRODUCTION

This action was commenced on June 2, 2022, by the filing of a Demand for Arbitration by Claimant, FaceTec, Inc. ("FaceTec"), against Respondent, Jumio Corporation ("Jumio"). The Demand was accompanied by FaceTec's Statement of Claims alleging Breach of the FaceTec Services Agreement entered by the Parties on October 8, 2018; Breach of the Covenant of Good Faith and Fair Dealing; and for an Accounting.

On July 1, 2022, Jumio filed its Response to FaceTec's Demand for Arbitration which denied each of FaceTec's Causes of Action and asserted a Counterclaim for Breach of Contract.

The claims at issue in this Arbitration arise out of the FaceTec Services Agreement (the "Agreement" or "Contract") entered by the Parties on October 8, 2018; as amended

1

by the First Amendment dated December 3, 2018; and the Second Amendment, dated March 10, 2021. The original Agreement is comprised of three fully integrated parts consisting of a two-page licensing agreement signed by the Parties and Exhibits A and B which define "Selected Services and Pricing, Billing and Payment Information," and "Terms and Conditions," of the Agreement, respectively.

FaceTec initiated this action pursuant to the Arbitration provisions set forth at Section 10.9 of Exhibit B. Based upon the Arbitration provisions of the Agreement, and with the concurrence of the Parties, I find that jurisdiction and venue over this dispute is properly vested before this Arbitral Tribunal and subject to the JAMS Comprehensive Arbitration Rules and Procedures. The "Governing Law" provision of the Agreement further provides at Section 10.1 that the Agreement shall be governed by laws of the State of California.

## BACKGROUND AND PROCEDURAL HISTORY

FaceTec is a technology company founded in 2013 that specializes in biometric security identification through a proprietary facial recognition software program it developed called "ZoOm Software." FaceTec's ZoOm software allows for the collection of facial image data through a digital device to verify the person interacting with a computer system is the authorized user and is a living human being rather than a replica, imposter, or digital impersonation. This process is commonly referred to as a "liveness authentication." Liveness authentication enables a company to enhance security and

reduce the risk of unauthorized access to that organization's computer system thereby preventing cybersecurity breaches or fraud.

Jumio is a multinational identity verification company and a leading provider of an online service platform designed to provide identity verification services to its customer companies. Jumio offers its customers the ability to verify the identity of their online users through a process similar to that used in the real world by looking at an ID and comparing it to the user's face. Jumio's services are used by both registered and non-registered industries, banks, healthcare companies, airlines, social networks, and many others to onboard and verify the identity and liveness of their new customers and to transact business with existing customers. Jumio represents that it supports over 4,000 ID document types across more than two hundred countries and territories.

The Services Agreement Jumio entered with FaceTec on October 8, 2018, licensed Jumio to integrate FaceTec's "liveness check" ZoOm software as part of the identity verification services it provides to its customers thereby enhancing the secure capacity of those customers to authenticate the identity of those with whom they transact business online.

The Agreement outlined the rights and obligations of the Parties for a term of three years with the option of automatic renewals thereafter for successive one-year periods unless the Agreement was not renewed or was terminated in the manner described in Section 6 of the Agreement. In exchange for the use of FaceTec's ZoOm

software, as outlined in Exhibit A to the Agreement, Jumio was required to pay FaceTec either a monthly minimum amount or fees calculated based on the volume of use of the licensed FaceTec software by Jumio's customers, whichever is greater.

The claims at issue in this Arbitration arise from the performance of the Parties with respect to their rights and obligations under the Services Agreement. To establish entitlement to an Arbitration Award in their favor, each Party bears the burden of proving their respective Breach of Contract and other claims by a preponderance of the evidence.

Although FaceTec's Statement of Claims and Jumio's Counterclaim were filed in June and July 2022, respectively, this Arbitration did not become active until January 2023. Thereafter, extensive discovery was conducted by the Parties requiring the resolution of a variety of discovery disputes.

Prominent among these disputes were two which arose shortly before the commencement of the Arbitration Hearing. One was FaceTec's Motion for Continuance of the Arbitration Hearing filed March 18, 2024, which after briefing and hearing was denied on April 1, 2024. The other was FaceTec's Motion to Compel Production of Jumio's Customer Contracts filed May 9, 2024, which after briefing and a hearing on May 28, 2024, was also denied by Order entered on May 30, 2024.

FaceTec's Statement of Claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and for an Accounting, are grounded in the common assertion that it was forced to pursue this arbitration because Jumio failed to pay the full

amounts to which FaceTec was entitled for the services it rendered under the Agreement and that Jumio intentionally concealed from FaceTec the essential revenue and accounting information required to verify the amounts Jumio owed under the Agreement.

FaceTec further contends that Jumio breached its duty under the Agreement to devote commercially reasonable efforts to promote, market, and make FaceTec's ZoOm Software Services available to its customers as part of Jumio's standard product offerings throughout the full three-year term of the Agreement.

Specifically, FaceTec alleges that Jumio materially breached the following seven specified obligations under the Service Agreement:

1. That Jumio violated Section B of the Agreement by failing to use commercially reasonable efforts to market and promote the ZoOm Face Matching and Liveness Verification Services to potential customers as part of its standard product offerings during the full term of the Agreement.

2. That Jumio failed to obtain consent from FaceTec before issuing press releases discussing its standard product offerings, its Customers, and/or its partners during the full term of the Agreement, in violation of Section 4.5 of Exhibit B to the Agreement.

3. That Jumio failed to compensate FaceTec $0.035 for each Transaction Service, in violation of Exhibit A and Section 2.12 of Exhibit B.

4. That Jumio failed to fully compensate FaceTec for the fees owed for the sale

of the Unlimited Face Authentication Services, in Violation of Exhibit A, and Section 2.12 of Exhibit B, to the extent Jumio's accounting reveals underpayment.

5. That Jumio failed to fully compensate FaceTec for the fees owed for the use of the Reverification Services, in violation of Exhibit A and Section 2.12 of Exhibit B, to the extent Jumio's accounting reveals underpayment.

6. That Jumio failed to upgrade FaceTec's ZoOm Software Services as agreed in the Second Amendment; and

7. That Jumio used FaceTec's ZoOm Software Services after the Agreement expired without compensation to FaceTec.

Jumio denies the claims alleged by FaceTec and asserts that it has fully performed its obligations under the Agreement or has been excused from performance because of FaceTec's conduct. Jumio counterclaims that FaceTec breached the following provisions of the Agreement by its conduct:

1. That FaceTec breached Section C. 1 of the Agreement by removing the user interface customization feature of the ZoOm Software and by forcing Jumio to accept updates that materially degraded its performance and functionality which significantly increased the False Rejection Rate.

2. That FaceTec breached Ex. A Sections 3.1 and 6.5 of the Agreement by refusing to timely provide Jumio with the software key required for Jumio and its customers

to be able to access the FaceTec software used in Jumio's product.

3. That by failing to provide Jumio with the updated ZoOm Software licensing key, FaceTec breached the covenant of good faith and fair dealing implied in every contract under California law to not do anything that would deprive Jumio of the benefits of the Agreement.

In addition to FaceTec's prayer for an accounting, both Parties seek an award of damages on their contract claims together with attorneys' fees and costs to the extent allowed by Section 10.9 of the Agreement.

The Arbitration Hearing commenced on June 24, 2024, and proceeded for seven non-consecutive days through July 9, 2024. Extensive post-hearing briefing was completed on September 3, 2024, and the matter is now ripe for decision.

## DISCUSSION AND FINDINGS

An Arbitration Award does not constitute an enforceable judgment. Although the facts and legal issues presented are familiar to the Parties, a recitation of factual findings supporting this Award is necessary to permit consideration of any motion to obtain an enforceable judgment confirming the Award before a court of competent jurisdiction in conformity with JAMS Rule 25 and the Federal Arbitration Act, 9 U.S.C. Sec. 1, et seq.

The factual findings and legal conclusions that follow reflect my analysis based on a preponderance of the evidence derived from admissions in the pleadings,

stipulations of the Parties, and the extensive testimony and hundreds of evidentiary exhibits received at the arbitration hearing, as well as my credibility determinations regarding the witnesses who testified.

The Parties have asserted a wide array of arguments and objections in the pleadings, throughout pretrial proceedings, at the seven-day hearing, and in over 350 pages of post-hearing briefing. These findings address only those arguments and objections which I conclude are material to the resolution of the claims at issue. They also turn on whether each Party discharged their respective contractual obligations under the Services Agreement in good faith.

Any findings which differ from the position of either Party to these proceedings are the result of my determinations as to relevance and credibility, burden of proof considerations, relevant legal authority, and the weight I have accorded to the evidence.

In addition to voluminous exhibits received into evidence, the Parties presented the testimony of the following ten percipient and expert witnesses:

**Kevin Tussy** is the Chief Executive Officer of FaceTec. Tussy offered extensive testimony regarding the founding of FaceTec, the negotiations between FaceTec and Jumio resulting in entry of the Services Agreement, and the perspective of FaceTec with respect to all aspects of FaceTec's relationship with Jumio concerning the claims and counterclaim at issue.

**Mark Abramson** is a cybersecurity expert who was called out of order due to

scheduling conflicts to offer expert rebuttal testimony on behalf of FaceTec in response to the expert report and anticipated testimony of Jumio's software development and implementation expert, Mark Himelstein.

**Josh Rose** is FaceTec's Chief Technology Officer. Rose offered testimony regarding the founding of FaceTec and explained that while Tussy oversaw the business side of the Company, he was principally responsible for the technological side. He testified regarding the development of FaceTec's ZoOm Software, the negotiations with Jumio leading to the Services Agreement entered on October 8, 2018, and the ongoing relationship between FaceTec and Jumio, including the events giving rise to the claims at issue.

**Mark Kuga** is a forensic economist with experience in forensic accounting. He testified regarding his calculation of FaceTec's damages and offered rebuttal testimony regarding the damages report prepared by Jumio's damages expert, Douglas Kidder.

**Philipp Pointner** is currently the Chief of Digital Identity and formerly Chief Product Officer for Jumio for over 20 years. He testified regarding the contract negotiations that led to the Services Agreement with FaceTec, the integration of ZoOm software into Jumio's product offerings, the subsequent breakdown in the relationship between Jumio and FaceTec, and Jumio's migration to iProov.

**Kevin Kwong** is Jumio's corporate Controller and formerly Jumio's Director of Revenue Recognition when Jumio entered the Agreement with FaceTec in 2018. Kwong

testified regarding the review of customer revenue contracts, invoicing, cash collections, and Jumio's accounting system during its relationship with FaceTec.

**Reinhard Hochrieser** is Vice President of Product Management responsible for running the identification verification and biometrics product line for Jumio. He testified remotely regarding his participation in the early prequalification discussions in June 2018 with FaceTec exploring the potential for a contractual relationship between them.

**Lukas Bayer** is the manager of product management responsible for biometrics and user experience for Jumio. Bayer was Jumio's main point of contact with FaceTec during their three-year relationship. He testified regarding his frequent interactions on behalf of Jumio with Josh Rose, Kevin Tussy, and others at FaceTec relating to the claims at issue in this case.

**Douglas Kidder** testified as Jumio's damages expert. He testified in rebuttal to the expert testimony of FaceTec's damages expert, Mark Kuga, and in support of Jumio's counterclaim for damages.

**Mark Himelstein** testified remotely as Jumio's expert on software development and implementation. He offered testimony in rebuttal to the expert cybersecurity testimony of FaceTec's expert, Mark Abramson.

Unsurprisingly, much of the evidence presented at the Arbitration hearing unfolded largely as portrayed by the Parties in their pre-hearing briefs. The testimony of the foregoing witnesses, and the exhibits received during their testimony, establishes the

following by a preponderance of the evidence:

After several months of preliminary discussions regarding feasibility of integrating ZoOm Software into Jumio's identity authentication product, and negotiations over specific contract terms, the Parties reached agreement and entered the FaceTec Services Agreement on October 8, 2018.

The Agreement granted Jumio a license to integrate FaceTec's ZoOm liveness software into its mobile and web channel identity verification product; obligated Jumio to compensate FaceTec in conformity with the Services and Pricing schedule set forth in Exhibit A; and required Jumio to "use commercially reasonable efforts to market and promote" the ZoOm Software to potential customers as part of its standard product offerings.

The Agreement was semi-exclusive to the extent that Sections 2.23 and 3.2 of the Agreement, as Amended on December 3, 2018, precluded FaceTec from contracting for ZoOm Software Service with six specified organizations during the term of the Agreement. The Agreement was operational for a term of three years with a provision for automatic renewal for successive one-year terms unless not renewed by either Party or terminated in accordance with Section 6 of Exhibit B.

The evidence adduced shows that the Parties experienced a collaborative and mutually beneficial relationship during the majority of the first year of their contractual term which FaceTec characterized as the "Honeymoon Phase." When technical issues

relating to Jumio's integration of the ZoOm software cropped up, they worked cooperatively to solve them, and the Parties publicly promoted each other within the financial technology industry. However, by late 2019 that relationship began to deteriorate, and the remainder of their three-year relationship was marked by mutual dissatisfaction, distrust, and ultimately, dissolution.

The record shows that in late 2019 and throughout much of 2020, Jumio became disenchanted when changes to FaceTec's software were made which inhibited Jumio's capacity to customize ZoOm to satisfactorily fit Jumio's liveness authentication product. Additionally, Jumio found the high frequency of software updates issued by FaceTec were difficult to adapt to their product for use by their customers and the end users of those customers in the marketplace. Customer complaints received by Jumio regarding the performance of the ZoOm software in Jumio's product further contributed to tension between the Parties.

FaceTec became frustrated during the same period by Jumio's numerous requests for technical assistance and their concomitant failure to follow FaceTec's updating directives. Of particular concern to FaceTec was Jumio's failure in November 2019 to upgrade the ZoOm Software to Version 8 which FaceTec considered of paramount importance from a security perspective. Combined with what FaceTec considered to be Jumio's lackluster efforts to promote the ZoOm Software to new customers the rift between the Parties continued to grow.

The mutual frustration experienced by the leadership teams of both FaceTec and Jumio was manifest in the tenor of FaceTec's communications with Jumio which predictably were not received warmly. On August 23, 2020, FaceTec CTO, Josh Rose, sent an email to his counterpart at Jumio, Labhesh Patel, caustically advising Jumio that "Jumio is a sales organization for FaceTec. Jumio works for us, not the other way around. Jumio needs us a lot more than we need Jumio..." The multi-page message further admonished Jumio that unless Jumio" will do as it's told with regards to updates, managed sessions, and KPM," it risked "permanently losing access to FaceTec's technology." Exhibit 169.

The following day, FaceTec's legal Advisor and Board Member, Michael Friedman, sent Jumio's General Counsel, Gina Signorello, a "formal Notice of Breach of Contract" advising that Jumio "had failed to uphold its obligations" under Sections 3.1 and 4.8 of the Agreement and demanding that Jumio cure the breaches within thirty-days in accord with Section 6.3. The communication further served as "notice of non-renewal of the Services Agreement according to the terms of Section 6.2." Ex. 170.

Six days later, on August 30, 2020, FaceTec CEO, Kevin Tussy, sent an email to Philipp Pointner, Chief of Digital Identity for Jumio, reiterating FaceTec's dissatisfaction with Jumio and stating in pertinent part:

> I don't want to be handcuffed to your fossilized model anymore, and it costs
> me more money to be Jumio's "Partner" than I make from it.... So, I want

out, and I'll use every breach in the Agreement I can find to do that, and if by some miracle you can actually cure these two infractions in time, and I can't find any other Breaches, then we will opt-out at the end for 2021.

Ex. 174.

Jumio did not respond to FaceTec's Notice of Breach or Mr. Tussy's email of August 30th until September 18, 2020, when Jumio's General Counsel, Gina Signorello emailed both Mr. Tussy and Friedman, denying the alleged breaches of the Agreement and acknowledging FaceTec's intention to not renew the Agreement at the end of the Agreement's initial term in October 2021. Ms. Signorello's email further stated that, "It's clear that the personal aspects of this commercial relationship have soured. At this point I think it would be productive for Jumio and FaceTec to discuss what would constitute a mutually agreeable go-forward path." Ex. 156.

The record supports the finding that by the end of August 2020 it was apparent to both Parties that their contractual relationship was damaged severely. In an effort to salvage the relationship, in late October 2020, FaceTec proposed the Parties explore a new agreement that would reduce FaceTec's risk for Jumio's alleged noncompliance with software updates and would allow Jumio to ███████████████████████████.

Discussions of this proposal continued for several weeks. During this period, on October 21, 2020, Lukas Bayer of Jumio reached out to FaceTec to renew Jumio's new encrypted licensing key for the ZoOm Software which was due to expire on December

1, 2020. However, given Jumio's failure to address the breaches claimed by FaceTec in their email of August 24th, Mr. Tussy responded that FaceTec could not provide Jumio with the encryption key "at this time." This strained the relationship between the Parties further as without the encryption key, Jumio's identity verification product would not function.

On November 23, 2020, when it appeared to Jumio that FaceTec would not relent and provide the necessary encryption key, Jumio filed an application for a mandatory Temporary Restraining Order in California's Santa Clara Superior Court to compel FaceTec to issue the key to Jumio. As these events occurred during the height of the Covid-19 Pandemic, the Court did not act on the TRO application in a timely manner.

However, on December 3, 2020, FaceTec agreed to provide an encryption key to Jumio which was valid only through March 31, 2021, and the Parties further agreed to continue negotiations to resolve the existing disputes. Those negotiations proceeded over the ensuing three months and on March 10, 2021, the Parties executed Amendment No. 2 to the FaceTec Services Agreement.

Amendment No. 2 made several changes to the original Agreement including adjustments to the timing of software Updates and Upgrades, elimination of the Exclusivity sections 2.23 and 3.2, the release of all necessary encryption keys to Jumio through the end of the term of the Agreement on October 8, 2021, and the withdrawal of the notice of non-renewal of the Agreement by FaceTec. Amendment No. 2 did not,

however, otherwise alter the terms of the Agreement.

Significantly, there were no assurances given by either Party that they intended to renew their Agreement when it expired on October 8, 2021. Indeed, based on the record adduced, I find that at least by September 18, 2020, following Kevin Tussy's August 30, 2020, email to Philipp Pointner, and the responsive email from Jumio's General Counsel, Gina Signorello of September 18, 2020, both Parties had internally made decisions that continuing their contractual relationship was not sustainable. Nothing in the ensuing negotiations over the issuance of FaceTec's encrypted software key or the negotiations leading to the Second Amendment to the Services Agreement of March 10, 2021, alters that finding. Rather, it reinforces it.

The record shows that the option of securing a new liveness authentication vendor was something Jumio had contemplated as early as March 2020 when the frustration, acrimony and distrust between the Parties had begun to fracture their relationship. Nothing in the Agreement prohibited Jumio from doing so. The testimony of Philipp Pointner and Lukas Bayer establishes that after Jumio received the corrosive communications from Josh Rose, Michael Friedman, and Kevin Tussy in August 2020, most particularly Tussy's notice that FaceTec intended to terminate the Agreement, Jumio had lost faith in FaceTec and concluded that to mitigate its damage and ensure continuity of service to its customers and their end users, the prudent course was to secure a new liveness vendor to replace FaceTec when the Agreement expired in October 2021.

Therefore, at the same time it was negotiating for issuance of the encrypted software key with FaceTec, Jumio entered negotiations with one of FaceTec's competitors, another provider of liveness authentication software named iProov. On November 25, 2020, Jumio entered a new Service Agreement with iProov for an initial term of two-years. RX 185. This arrangement was burdensome because it forced Jumio to also pay for iProov's services as well as those for FaceTec's, but deemed necessary by Jumio to ensure no interruption in liveness authentication services to its customers.

The process of integrating iProov's software into Jumio's product began in January 2021 and Jumio began migrating existing customers to the iProov software in March 2021 through the end of the contract period with FaceTec in October 2021.

Although Jumio did not notify FaceTec of its new agreement with iProov when it occurred, an internal email from Kevin Tussy to Josh Rose on July 7, 2020, Tussy understood the necessity of such action when he wrote, "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. RX 120.

Although both FaceTec and Jumio argue that the words and conduct above show bad faith on the part of the other, I find, however, that rather than reflect efforts to deprive

each other of the benefits of the Services Agreement, it more probably evidences their respective attempts to mitigate their potential losses and preserve the benefits of the existing Agreement as much as possible through the end of its term in October 2021. Clearly the Parties recognized by this time that the Agreement was not destined to survive beyond the end of the three-year term which expired in October 2021.

In an email exchange between Jumio's General Counsel, Gina Signorello, and Kevin Tussy of April 30, 2021, Jumio gave FaceTec notice of non-renewal of the Agreement set to expire on October 8, 2021. Ex. RX 262. Because Jumio had already transitioned its liveness authentication service to iProov, Jumio did not find it necessary to invoke its Ramp Down rights under Section 6.5 of the Agreement and the Agreement expired at the end of its term on October 8, 2021.

FaceTec's Arbitration Demand and Statement of Claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Accounting was filed eight months later, and Jumio's Counterclaim for Breach of Contract was filed in response.

## FACETEC'S CLAIMS

The First, Second, and Third Causes of Action alleged in FaceTec's Statement of Claims assert claims for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and for an Accounting, respectively.

Under California law, to prove a cause of action for breach of contract, FaceTec must prove each of the following essential elements by a preponderance of the evidence: (1) the existence of the contract, (2) FaceTec's performance or excuse for nonperformance, (3) Jumio's breach, and (4) the resulting damages to the FaceTec. *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal. 4th 811, 821; *Piedmont Capital Management, L.L.C. v. McElfish* (2023), 94 Cal. App. 5th 961, 968. As outlined earlier, FaceTec alleges that Jumio breached the Services Agreement in seven specific ways. Each of material breaches of the Services Agreement alleged by FaceTec will be explored separately below.

The cases are legion that under California law, there is an implied covenant of good faith and fair dealing implied in every contract. *Comunale v. Traders & General Ins. Co.,* 50 Cal. 2d 654, 658 (1958). Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. *Seaman's Direct Buying Service, Inc., v. Standard Oil Co.,* 36 Cal. 3d 752, 768 (1984).

In its Response to FaceTec's Demand for Arbitration filed July 1, 2022, Jumio contends that because the implied covenant is simply a part of the breach of contract claim it is not a separate claim. I find it unnecessary to reconcile this issue. As is clear from the briefing, the Parties ascribe good faith and bad faith to the conduct of each other throughout this case and I will simply address whether the conduct or words of those involved in the alleged breaches were in good or otherwise as I deem appropriate in

adjudicating the breach of contract claims asserted by both Parties.

Similarly, FaceTec's claim for an accounting is woven into allegations of specific material breaches asserted in the First Cause of Action for Breach of Contract, and in post-Hearing briefing have become a focal point of FaceTec's legal arguments in support of its claims. Therefore, whether viewed as a prayer for relief in aid of calculating damages where a material breach is established, or as a stand-alone claim for distinct relief, I find it appropriate to address FaceTec's claim for an accounting where it intersects with its claims for breach of contract.

Under California law, an action for an Accounting requires a showing that a relationship exists between a plaintiff and a defendant, which requires an accounting, and that some balance is due that can only be ascertained by an accounting. An inherent limitation on such an action is that an accounting, "is not available where the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by calculation." *Teselle v. McLoughlin,* 173 Cal. App. 4th, 156, 179 (2009); see also *Sass v. Cohen,* 10 Cal. 5th 861, 869 (2020). As recognized in *Sass, Id.,* where there is "information asymmetry," an accounting may be used as a discovery device.

Jumio argues that because the evidence shows it sent FaceTec detailed usage logs for the very purpose of enabling FaceTec to track Jumio's usage and issue invoices, and because during discovery Jumio produced a spreadsheet with extensive details of its

███████, FaceTec has failed to show any "information asymmetry" which would support FaceTec's claim for a post-Hearing accounting.

To the extent some of the seven alleged breaches of the Services Agreement are accompanied by a claim for an accounting, they will be addressed jointly below.

## 1. Whether Jumio failed to promote and market FaceTec in a commercially reasonable manner.

The first of the seven material breaches of the Services Agreement alleged by FaceTec is that Jumio violated Section B of the Agreement by failing to use commercially reasonable efforts to market and promote the ZoOm Face Matching and Liveness Verification Services to potential customers as part of its standard product offerings during the term of the Agreement.

Specifically, FaceTec acknowledges that Jumio fulfilled this obligation during the initial phases of the Agreement but that once tensions grew between the Parties throughout 2020, Jumio's promotional efforts lagged and then ceased after Jumio signed its vendor Agreement with iProov through the termination of the Agreement in October 2021.

Jumio responds that it was not commercially reasonable for FaceTec to expect Jumio to continue its promotional efforts after their relationship had so deteriorated to the point that by August 2020 FaceTec had notified Jumio that it wanted to end their

contractual relationship and Kevin Tussy admits he began telling potential customers and investors that they should not work with Jumio. Jumio further contends that when FaceTec withheld the ZoOm software encrypted licensing key it could no longer trust FaceTec to reliably provide Jumio's customers with Liveness services and was left with no alternative but to secure a new vendor of those services such as iProov. Finally, Jumio argues that inequitable conduct toward Jumio throughout 2020, and particularly in withholding the encrypted software key, endangered the viability and continuity of Jumio's business, and relieved Jumio of its obligations to promote FaceTec's software under the equitable doctrine of unclean hands. I find Jumio's arguments persuasive.

The term, "commercially reasonable efforts," is not defined by the Parties in the Agreement, and there is no universally accepted definition of the term under California law. Whether something is commercially reasonable is necessarily dependent on the relevant circumstances presented, and it is clear that "the principle of 'commercially reasonable efforts' permits the performing party to consider its economic business interests." *Citri-Lite Co. v. Cott Beverages, Inc.* 721 F. Supp. 2d 912, 926 (2010); see also *Eastwood Ins. Servs., Inc. v. Titan Auto Ins. Of N.M., Inc.* 469 Fed. Appx. 596, 598 (9th Cir. 2012). Commercially reasonable obligations certainly did not obligate Jumio to promote FaceTec software in the face of the kind of vituperative aspersions directed at it by FaceTec in August 2020, and thereafter.

I find that the record adduced, and the persuasive authority cited in post-hearing

briefing compels the conclusion that it was not commercially reasonable for FaceTec to expect Jumio to market and promote FaceTec's liveness software where, as here, FaceTec told Jumio in writing in August 2020 that it wanted out of the Agreement and would not renew it at the end of the contract term, and thereafter threatened to withhold the ZoOm software encrypted license key. FaceTec's actions threatened Jumio's ability to ensure business continuity for itself and its customers. I further find that Jumio's acted in a commercially reasonable manner in seeking a new liveness authentication vendor to succeed FaceTec at the end of the contract term and to begin the process of integrating iProov into Jumio's operations.

The advent of the Second Amendment to the Agreement did not change Jumio's obligations with respect to promoting FaceTec. However, when the relationship between FaceTec and Jumio deteriorated radically in August and September 2020, what constituted "commercially reasonable conduct changed too. Under the circumstances presented, any failure by Jumio to promote FaceTec shown in this record was commercially reasonable.

In sum, I find that Jumio's conduct did not breach the terms of the Agreement by failing to promote and market FaceTec's ZoOm software as alleged by FaceTec.


**2. Whether Jumio violated Section 4.5 of the Agreement.**

The second breach of the Services Agreement alleged by FaceTec is that Jumio

failed to obtain consent from FaceTec before issuing press releases discussing its standard product offerings, its Customers, and/or its partners during the full term of the Agreement, in violation of Section 4.5 of Exhibit B to the Agreement.

The Parties do not focus significantly on this alleged breach in post-hearing briefing. The evidence does show that from the inception of the Agreement through most of 2020, the Parties collaborated on the issuance of press releases discussing FaceTec's ZoOm Software Services.

The evidence adduced, however, shows that by April 2021, Jumio's General Counsel, Gina Signorello, exchanged emails with Kevin Tussy advising that as the Parties had an expiring contract, Jumio would no longer be issuing press releases in connection with the Agreement. Ex. RX 262. Jumio also issued a press release announcing the addition of FaceTec's competitor, iProov, to its KYX Platform in April 2021 without the consent of FaceTec. However, FaceTec has not offered evidence or presented argument on how it was damaged by Jumio's contract with a second vendor which was not prohibited by the Agreement. I find it was otherwise commercially reasonable given the circumstances of the Parties' relationship. Therefore, I find that FaceTec has failed to prove the second alleged breach against Jumio.

3. **Whether Jumio failed to compensate FaceTec ████ for each Transaction Service in violation of Exhibit A and Section 2.12 of Exhibit B.**

Exhibit A of the Services Agreement outlines the fees Jumio was required to pay FaceTec for each "Transaction Service." Specifically, Exhibit A provides at Section 1 that "Jumio agrees to pay FaceTec a monthly minimum payment or ███████ for each Transaction Service as defined in Exhibit B 2.19, whichever is greater. Section 2.19 in turn defines "Transaction Services" as, "An interactive session where a device uses the ZoOm Software Services to capture and evaluate images of an end-user's face as they attempt to create a new account using Jumio's NetVerify service or similar service provided by Jumio,…for its internal use and for the purposes contemplated under this Agreement, …"

FaceTec alleges that Jumio underpaid FaceTec for each Transaction Service, as defined by the Services Agreement, by unilaterally deciding to group multiple liveness "attempts" or "sessions" together to minimize the fees it owed FaceTec. In doing so, FaceTec contends Jumio applied its own self-serving interpretation of the term "Transaction Services" contrary to the mutual intent of the parties' at the time the Services Agreement was formed.

Jumio responds that the plain language of the Agreement is clear that Jumio owed FaceTec ███████ for the Liveness services performed in connection with one Jumio "NetVerify Transaction" which is the name of the product sold by Jumio to its customers during which end users attempt to create a new account with one of Jumio's customers. Jumio argues that the only reasonable interpretation of this contractual language is that a

"Transaction Service" is an interactive session where an end user is attempting to create a new account using Jumio's NetVerify service which was the name of the product sold by Jumio to its customers during which end users attempt to create a new account with one of Jumio's customers.

I agree with Jumio's interpretation of the definition of a Transaction Service under Section 2.19. This interpretation is also supported by the words and conduct of the Parties during the contract period as reflected in the citations to the evidentiary record set forth in Jumio's Post-Arbitration Brief of August 7, 2024, at pages 30 - 39, and in its Opposition to FaceTec's Post-Arbitration Brief of August 21, 2024, at pages 12 – 20. Although not determinative of the issue, the post-Contractual conduct and internal discussions of the Parties are not, as argued by FaceTec, irrelevant. They reflect the ongoing dialogue of the Parties throughout much of their relationship and are circumstantially congruent with this reasonable interpretation of the definition of Transaction Service.

On the record adduced, I find that FaceTec has failed to prove by a preponderance of the evidence that Jumio failed to compensate FaceTec for each Transaction Service as required under the Agreement. Under California law, the right to an accounting is derivative and depends on the validity of a plaintiff's underlying claims. *Zepeda v. PayPal, Inc.,* 777 F. Supp. 2d 1215, 1221 (2011). Having failed to show the alleged breach of the Services Agreement, FaceTec has also failed to show any basis to warrant

an accounting in connection with Jumio's payment for Transaction Services.

4. **Whether Jumio failed to fully compensate FaceTec for the fees owed for the sale of Unlimited Face Authentication Services, in violation of Exhibit A, and Section 2.12 of Exhibit B, to the extent Jumio's accounting reveals underpayment.**

The Services Agreement states at Exhibit A. 3 that, "Jumio agrees to pay FaceTec 35% of the revenue it receives from each of Jumio's customers that purchase Unlimited Face Authentication Services as defined in Exhibit B 2.21."   Section 2.21 of Exhibit B defines Unlimited Face Authentication Services as follows:

> A subscription service that provides access to an unlimited user-initiated interactive sessions where a device running the ZoOm Software Services captures images of a user's face, verifies liveness and attempts to match the user's biometric data to previously enrolled biometric data for the purpose of re-accessing an account previously created using the ZoOm Software Services and Jumio's NetVerify service or similar service provided by Jumio.

Facetec argues that because the Services Agreement creates a revenue sharing relationship with Jumio in which Jumio has exclusive access and control over financial records bearing on the profits, the covenant of good faith and fair dealing implied in every contract accords FaceTec the right to an accounting with respect to profits derived

under the Services Agreement from the sale of Unlimited Face Authentication Services, and for Jumio's continued use of "biometric data" collected by the FaceTec software for Unlimited Authentication users. *McClain v. Octagon Plaza, LLC,* 159 Cal. App. 4th 784, 806 (2008).

Jumio responds that Exhibit B, Section 8 of the Services Agreement served to avoid the kind of information asymmetry at issue in McClain and related cases cited by FaceTec. Specifically, the record shows that pursuant to Sections 8.1 and 8.2, it was FaceTec's obligation, not Jumio's, to track Jumio's usage and to invoice Jumio. In accord with Section 8, Jumio sent FaceTec detailed and anonymized usage data to be used by FaceTec to "monitor usage, create invoices, and to improve existing ZoOm Software Services." RX 17, Ex. B, Sec. 8.1, 8.2. The record adduced supports Jumio's arguments.

Specifically, as argued by Jumio, the record adduced at the Hearing relating to FaceTec's claim for an accounting shows that FaceTec had extensive information regarding Jumio's usage of the ZoOm Software for the services Jumio provided. This gave FaceTec ample information upon which to generate invoices for usage to Jumio. I find further that the structure and practice implemented by the Parties pursuant to Section 8 of the Agreement renders McClain, and similar cases relied upon by FaceTec, inapposite because Jumio clearly did not have exclusive access and control over the financial records bearing on the profits.

Jumio's corporate Controller, Kevin Kwong, testified, it was typical for Jumio

vendors, including FaceTec, to send invoices to Jumio, not the other way around. To assist FaceTec in creating those invoices, and pursuant to Sections 8.1 and 8.2 of the Services Agreement, Jumio provided FaceTec with "usage logs" containing information about the number and type of Transaction Services and Authentication Services being performed.

The record also shows that FaceTec itself determined what information was collected by the usage logs to equip it with sufficient information upon which to generate the invoices issued to Jumio. Any inefficiency or inaccuracy in doing so was, as conceded by FaceTec, its own fault. Based on those logs, FaceTec sent Jumio monthly invoices throughout the majority of the contract period without asking for additional information from Jumio. The information in the logs would have enabled FaceTec to determine if Jumio was not accurately paying for Unlimited Authentication services.

Moreover, in discovery conducted after FaceTec filed its Arbitration Demand, Jumio produced the Unlimited Authentication Spreadsheet which was developed from Jumio's financial records database and which Jumio also relied upon during the term of the Agreement. The record further shows that when issues arose concerning billing in 2019 and 2020, the Parties discussed and resolved them, and that when FaceTec determined it had a different view of how Transaction Services were to be billed, it did not raise the matter with Jumio until April 2021, after the Second Amendment was signed. None of this amounts to the type of information asymmetry that underpins a claim

for an accounting for either Transaction Services, or for Unlimited Authentication services. Neither does the record support a finding that there are inaccuracies in the Unlimited Authentication Spreadsheet produced for FaceTec by Jumio in discovery on May 12, 2023.

Finally, in pre-Hearing briefing, FaceTec for the first time argues it is entitled to an accounting for a "biometrics claim."  At the Pretrial Conference conducted on June 18, 2024, Jumio objected that the late addition of a new claim was unfairly prejudicial to Jumio and violative of JAMS Rule 9. Jumio renewed its objection in a Letter Brief filed on June 21, 2024. Based on Jumio's arguments in its pre-hearing Letter Brief of June 21, 2024, and at pages 45 – 48 of its Post-Hearing Opposition Brief, I find that FaceTec has failed to meet the threshold of showing of a cognizable biometrics claim, particularly where, as here, Jumio has not had the opportunity to conduct discovery or otherwise challenge this new claim. I also find that FaceTec has failed to prove entitlement to an accounting.

5. **Whether Jumio failed to fully compensate FaceTec for the fees owed for the use of the Re-Verification Services, in violation of Exhibit A, and Section 2.12 of Exhibit B, to the extent Jumio's accounting reveals underpayment.**

Although a material breach of the Agreement is alleged in FaceTec's Statement of Claims for Jumio's failure to pay for Re-Verification (single use authentication) services,

FaceTec failed to present evidence to support its claim at the Arbitration hearing and presented no argument on the subject in Pre-Hearing or Pos-Hearing briefing.

Jumio argues in its Post-Arbitration Brief filed August 7, 2024, that it was undisputed at the Arbitration hearing that no Jumio customers purchased Re-Verification services. Jumio further acknowledges that due to a miscommunication between Lukas Bayer and Kevin Kwong, Jumio mistakenly reported to FaceTec that there had been "Re-Verifications" by a number of first-time users under the Unlimited Authentication plan and that it erroneously paid FaceTec $96,416 through the Unlimited Authentication revenue share. As a result, Jumio contends that it is entitled to repayment from FaceTec for the $96,416 it mistakenly paid.

Based on the foregoing, I find that FaceTec has failed to prove its claim for compensation for Re-Verification services. Whether Jumio is entitled to repayment will be addressed below in the section of this Award regarding Jumio's counterclaims.

## 6. Whether Jumio failed to upgrade the FaceTec ZoOm Software services as agreed in the Second Amendment.

As discussed earlier in this Award, a chronic area of contention between the Parties was, from FaceTec's perspective, the failure of Jumio to implement software updates and upgrades promptly, and from Jumio's perspective, the unreasonable number of upgrades and updates submitted by FaceTec.

The sixth breach of the Agreement alleged by FaceTec is that Jumio failed to comply with Section 3 of Amendment No. 2 to the FaceTec Services Agreement executed on March 10, 2021, which Amended Section 4.8 (Updates and Upgrades) of Exhibit B of the original Agreement and required Jumio to implement FaceTec's v.9.1 software update upon its release, as well as subsequent updates issued by FaceTec.

As summarized earlier, the negotiations leading to the Second Amendment followed a near total breakdown in the relationship of the Parties with FaceTec's notice of non-renewal of the Agreement which was later withdrawn; FaceTec's withholding of the ZoOm Software encryption key until the eve of its expiration; Jumio's application for a TRO in California Superior Court; and Jumio's contract with and migration to iProov as a new liveness vendor to succeed FaceTec when the Agreement expired in October 2021. Nonetheless, negotiations continued in an effort to reach agreement on what Jumio's General Counsel, Gina Signorello, characterized in her email of September 18, 2020, as "a mutually agreeable go-forward path."

The product of those negotiations was the Second Amendment to the Agreement on March 10, 2021. The Second Amendment did not reflect the intention of either Party to renew the Agreement beyond October 2021. Although FaceTec had withdrawn its Notice of non-renewal issued in August 2020, Jumio was not forthcoming until April 7, 2021, regarding its intention to end its contractual relationship with FaceTec when it expired in October. The record adduced shows that at this time the level of distrust

between the Parties was so great that no reasonable person on behalf of FaceTec or Jumio would have anticipated their relationship would continue. The evidence suggests Jumio was attempting to preserve a commercially reasonable relationship with FaceTec pending the inevitable expiration of the Agreement at the end of its term and the full transition of Jumio to iProov as its liveness vendor.

The record is also clear that from the outset of the relationship, FaceTec had emphasized the importance of security and the application of software updates and upgrades to maintain cybersecurity of its ZoOm software. Therefore, FaceTec was legitimately concerned that Jumio remain vigilant about implementing important security upgrades when they were issued. Jumio insists that it too was concerned about cybersecurity of its products and was vigilant in its adherence to the best cybersecurity industry practices. Nevertheless, the record shows that by April 2021, Jumio had not yet implemented FaceTec's v.9.1 software update.

Jumio argues, however, that the security issues raised by FaceTec are irrelevant to the breach of contract issues alleged by FaceTec in this case. FaceTec responds that Jumio's failure to implement the software updates is highly relevant because a party claiming breach of contract must "prove that it satisfied its performance obligations under the agreement, and essential element of its claim for breach of contract." *Navcom Technology, Inc., v. Oki Electric Industry Co9, LTD.,* 756 F. Appx. 682, 684 (2018). FaceTec continues at page 27 of its Post-Hearing Responding Brief of August 22, 2024,

that, "Although FaceTec did not make a claim for damages arising from Jumio's failure to update as required by the Services Agreement because the claims were negotiated with the Second Amendment, Jumio must still prove that it performed its obligations" to avail itself of its breach of contract counterclaim against FaceTec.

In sum, FaceTec's sixth alleged breach of contract is not an affirmative claim for relief, but instead is an affirmative defense claim in response to Jumio's Counterclaim for breach of contract which will be addressed below. Therefore, it will be treated as such, but no affirmative relief will be granted with regard to this alleged breach of the Agreement.

7. **Whether Jumio Used FaceTec's ZoOm Software Services After the Agreement Expired.**

FaceTec's Statement of Claims provides no allegations of fact to support this alleged breach of the Services Agreement. This alleged breach was not addressed in Pre-Hearing or Post-Hearing briefing, and not evidence was offered at the Arbitration hearing on the issue. Therefore, I find that FaceTec has failed to prove that Jumio breached the Agreement in the manner alleged.

8. **FaceTec's Claim for Monetary Damages**

FaceTec contends that Jumio's material breaches of the Services Agreement have

resulted in significant monetary damages to FaceTec of at least $6,993,004, but that the true extent of its damage can only be determined after an accounting of Jumio's business records. FaceTec relies on the testimony and Expert Report of its damage expert, Dr. Mark Kuga, who, based on information available, calculated that FaceTec is owed $864,189 to account for unpaid liveness attempts; $4,932,415 for revenue lost as a result of Jumio's failure to promote FaceTec; and $1,196,400, for Unlimited Authentication Services that were migrated to iProov. See FaceTec's Post-Hearing Opening Brief at pages 30-37, and Post-Hearing Responding Brief at pages 98-106.

Jumio responds that FaceTec has failed to show it suffered any damage because it has failed to prove its breach of contract claims. It further contends that even if FaceTec had established that Jumio had breached the Parties' Agreement it has offered no reliable evidence to support its damage claims.

Jumio proceeds at pages 70-80 of its post-Arbitration brief and pages 71-75 of its Opposition to FaceTec's Post-Arbitration brief, to recount the evidence and expert rebuttal testimony of Jumio's damages expert, Douglas Kidder, showing that the damage figures calculated by Dr. Kuga are unreliable and speculative, and based on unreliable data, flawed assumptions, or disregard of important contract terms.

Although I find Dr. Kuga's damage analysis unpersuasive and unreliable for the reasons asserted by Jumio, I find it unnecessary to adjudicate each element of their detailed analysis because I have found above that FaceTec has failed to prove the

essential underlying breaches of the Agreement alleged. Proof of damage is an element of any breach of contract claim. But it is derivative of the essential element showing that Jumio breached the contract and that the breach caused the damages sought. FaceTec has failed to do so. I therefore find that FaceTec's claim for contractual damages must be denied.

## JUMIO'S COUNTERCLAIM

In its Response to FaceTec's Demand for Arbitration and Statement of Claims filed July 1, 2022, Jumio asserts a Counterclaim for Breach of Contract alleging FaceTec repeatedly failed to comply with its contractual obligations under the Services Agreement. The specific allegations giving rise to the Counterclaim are set forth in the Background and Procedural History section of this Award and each will be addressed in the order raised.

1. **Whether FaceTec Breached Section C. I of the Agreement by Removing the User Interface Customization Feature of the ZoOm Software and Forced Jumio to Accept Updates that Materially Degraded its Performance and Functionality which Significantly Increased the False Rejection Rate.**

Section C. 1 of the Agreement provides in pertinent part:

████████████████████████████████████████



The evidence adduced at the Hearing shows that during negotiations leading to the Agreement between the Parties, Jumio stressed the importance of being able to customize the ZoOm Software to interface with Jumio's customer's application. In essence, Jumio sought software that enabled Jumio to control the look and feel of FaceTec's product to provide Jumio's customers with a seamless user experience. The configuration of the ZoOm Software met these requirements when the Agreement was entered in October 2018.

However, Jumio contends that when FaceTec released Version 8 of the ZoOm Software on November 19, 2019, it required a switch from "unmanaged sessions" to "managed sessions" which placed ████████████████████████████████████████ ████████████████████████████████████████

Jumio argues this upgrade degraded its ability to customize the ZoOm Software in the same manner as it had previously and that this amounted to a breach of the Agreement, "or at a minimum and anticipatory breach," of the Services Agreement.

FaceTec maintains that this upgrade of its ZoOm Software was an important and

necessary security upgrade to ████████████████████████████████████ ████████████████████████████████. FaceTec further contends that the upgrade was within its rights under the broad language of Section C. 1 of the Agreement to, ██████████████████████████████████████████████ ████████████████. FaceTec argues that this makes sense, since FaceTec had the expertise to know how and when to improve the security of its own software and even had a duty to do so. I agree with FaceTec's argument. FaceTec further argues that the Integration Clause at Section 10.7 of the Services Agreement renders pre-contract negotiations inadmissible. Again, I agree.

In light of all the evidence received on this issue, I find that although the disagreements of the Parties over the upgrades at issue reflect in part the tension and eventual breakdown in the commercial relationship between them, it did not materially degrade the functionality or constitute a breach of the Agreement by FaceTec. Therefore, I find that Jumio's has failed to prove its first claim of a material breach as alleged.

2. **Whether FaceTec Breached Ex. A Sections 3.1 and 6.5 of the Agreement by Refusing to Timely Provide Jumio with the Software Key Required for Jumio and its Customers to be Able to Access the FaceTec Software Used in Jumio's Product, and**

3. **Whether by Failing to Provide Jumio with the Updated ZoOm Software**

**Licensing Key, FaceTec Breached the Covenant of Good Faith and Fair Dealing.**

The dispute surrounding FaceTec's delayed production of the encrypted licensing key to Jumio was a critical inflection point in the relationship of the Parties. Because the second and third alleged breaches are interconnected and based on the same operative facts, I will treat them together.

Section 3.1 of the Agreement grants Jumio a license to allow Jumio Customers to access and use the "FaceTec Provided Services." To ensure against an abrupt termination of the access licensed, Section 6.5 of the Agreement further provides that upon termination or expiration of the Agreement, Jumio is entitled to enjoy access for an additional period of twelve months after termination "solely for maintenance and support of Jumio Customers who have already purchased FaceTec Provided Services under a Jumio Customer Agreement."

Jumio alleges that notwithstanding these provisions, in August 2020, FaceTec threatened to permanently cut off access to its software by Jumio and its customers. This and other communications from FaceTec to Jumio in August 2020 set off a chain of events which I find drove an already tenuous relationship between the Parties to permanent expiration at the end of the Agreement's term in October 2021. These events surrounding FaceTec's withholding of the ZoOm Software licensing encryption key in August 2020 are recounted earlier in this Award. The record adduced shows by a

preponderance of the evidence that although FaceTec never carried through on its threat to cut off Jumio's access, it pressed the threat to do so until execution of the Second Amendment to the Agreement on March 10, 2021. This conduct forced Jumio to attempt unsuccessfully to obtain temporary injunctive relief in California Superior Court prior to FaceTec relenting and providing a temporary licensing key shortly before expiration of the old one in December 2020.

Combined with FaceTec's notice of non-renewal of the Agreement in August 2020, and communications from FaceTec's leadership team that can only be described as acrimonious and unprofessional, Jumio came to the conclusion that its contractual relationship with FaceTec would not survive beyond its natural expiration date in October 2021. Moreover, Jumio had no assurance that FaceTec would not again threaten to withhold the licensing key before the end of the contractual term. As a result, Jumio decided to negotiate a contract with iProov in November 2020 to provide liveness authentication services for Jumio customers. There was no prohibition to doing so under the Agreement with FaceTec, and it relieved Jumio of the need to exercise its "Ramp Down" option under Section 6.5 of the Agreement which would have necessarily extended the rancorous business relationship with FaceTec. Given these circumstances, I find that Jumio's conduct was a commercially reasonable effort to protect its customers and itself.

Did FaceTec's threat that Jumio risked losing access to its software as expressed in the August 23, 2020, email from Josh Rose to Labesh Patel, and subsequently withholding the licensing key until shortly prior to the expiration of the exiting key constitute a breach of the Agreement by FaceTec? I find that it did not. Neither did FaceTec's notice of non-renewal followed by negotiations to secure the Second Amendment to the Agreement. I find that although the tenor of communications by FaceTec were unprofessional and offensive, however grudgingly, the material terms of the Agreement were ultimately adhered to.

Whether FaceTec's conduct violated the implied covenant of good faith and fair dealing is a closer question which is obscured to some extent by the deplorable tenor of the communications from FaceTec to Jumio as their business relationship deteriorated. But the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract and rests upon the existence of some specific contractual obligation. *Moore v. Wells Fargo Bank, N.A.* 39 Cal. App. 5th 280, 291 (2019); *Racine v. Laramie, Ltd. V. Department of Parks & Recreation,* 11 Cal. App. 4th 1026, 1031 (1990). Insulting and unprofessional words or conduct that do not breach the actual terms of the Agreement at issue do not satisfy Jumio's claim for breach of the covenant of good faith and fair dealing.

Additionally, incurring the cost of developing a contingency plan in case its customers lost access to FaceTec's services; the costs incurred by the early migration to

iProov as an alternate liveness vendor; and the fees incurred in attempting to secure temporary injunctive relief in state court, while reasonable business decisions by Jumio, were not the product of an actual breach of the Agreement by FaceTec.

Regardless, as is the case with respect to FaceTec's unsuccessful damage claims, where, as here, Jumio has failed to prove its Counterclaim for breach of contract, it is not entitled to recovery of damages.

### 4. Jumio's Overpayment to FaceTec for Re-verification and Unlimited Authentication Services under the Agreement.

In its pre-Hearing brief, citing the Expert Report of its damages expert, Douglas Kidder, Jumio argued that it had erroneously overpaid FaceTec $96,416 for Re-verification services that its customers never used, and an additional $52,191 in Unlimited Authentication revenue share for revenue that Jumio never actually received from BTG Pactual, a customer that cancelled its contract and never actually utilized the service and for which it should be reimbursed by FaceTec.

Douglas Kidder testified to these overpayments at the Arbitration hearing and explained that with adjustments required under the Agreement, the total reimbursement due to Jumio from FaceTec was $141,024. Kidder's testimony in this regard went unchallenged at the hearing. Though Jumio repeated its demand for reimbursement of these sums in both its Post-hearing Opening and Opposition briefs filed August 7 and

August 21, 2024, FaceTec has offered no response or objection to the request for reimbursement.

I find that although Jumio's claim for reimbursement is not a claim for damages predicated on its Counterclaim for breach of contract, it does qualify as a claim for reimbursement of mistaken overpayments to FaceTec and is within the scope of the Arbitration clause at Section 10.9 of the Agreement. Therefore, as it is uncontroverted, I will include it in the Award not as an award of damages for breach of contract, but as repayment of sums erroneously paid by Jumio to FaceTec which is unopposed.

## ATTORNEYS' FEES AND COSTS

Both Parties contend that if they are determined to be the prevailing party, they should be awarded their attorneys' fees and costs. Section 10.9 of the Agreement provides the following with respect to such an award: "The attorneys' fees and costs incurred by the prevailing party shall be paid by the parties in the manner determined by the arbitrator."

As reflected in my findings above regarding the respective claims of the Parties, I now find that neither FaceTec nor Jumio can on balance be deemed to be the "prevailing party" in this action. *Scott Co. of California v. Blount, Inc.,* 20 Cal. 4th 1103, 1108-1109 (1999). Therefore, I find that neither Party is entitled to recover its attorneys' fees or costs of the action.

## CONCLUSION AND AWARD

Based upon the findings and conclusions above, IT IS ORDERED that the following AWARD hereby entered with respect to the Claims and Counterclaims filed in this case:

1. Claimant, FaceTec, Inc.'s, claims against Respondent, Jumio, Corp., for breach of contract, breach of the covenant of good faith and fair dealing, and for an accounting are not sustained by the evidence and are Denied.

2. Respondent, Jumio, Corp.'s, Counterclaim against Claimant, FaceTec, Inc., for breach of contract is not sustained by the evidence and is Denied.

3. Respondent, Jumio, Corp., is entitled to recover from Claimant, FaceTec, Inc., the sum of $141,024 as and for reimbursement for overpayments for Re-verification and Unlimited Authentication Services under the Agreement.

4. Neither Party is entitled to recover its attorneys' fees or costs for this action.

**IT IS SO ORDERED.**

Dated: October 15, 2024

Hon. Philip M. Pro
Arbitrator