# EXHIBIT 5

```
                                           Pages 1 - 61

             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

FACETEC, INC.,                )
                              )
          Plaintiff,          )
                              )
  VS.                         )   NO. C 24-03623 RFL
                              )
JUMIO CORPORATION,            )
                              )
          Defendant.          )
                              )

                                 San Francisco, California
                                 Tuesday, February 11, 2025
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
        ONE LLP
        23 Corporate Plaza - Suite 150-105
        Newport Beach, California  92660
   **BY:  NATHANIEL L. DILGER, ATTORNEY AT LAW**

        ONE LLP
        400 Corporate Pointe - Suite 300
        Culver City, California  90230
   **BY:  WILLIAM J. O'BRIEN, ATTORNEY AT LAW**

For Defendant:
        PERKINS COIE LLP
        1201 Third Avenue - Suite 4900
        Seattle, Washington  98101
   **BY:  GRANT E. KINSEL, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                  U.S. District Court - Official Reporter

|     |     |     |
| --- | --- | --- |
| 1 | **Tuesday - February 11, 2025** | **10:06 a.m.** |

**P R O C E E D I N G S**

---oOo---

**THE CLERK:** Calling civil case 24-3623, FaceTec, Inc. versus Jumio Corporation.

Counsel, please come to the podiums and state your appearances for the record.

**MR. DILGER:** Good morning, Your Honor, Nate Dilger Plaintiff's Counsel for FaceTec. With me is Bill O'Brien, my co-counsel.

**MR. O'BRIEN:** Good morning, Your Honor.

**MR. KINSEL:** Good morning, Your Honor, Grant Kinsel for Jumio. With me today is Jumio's General Counsel Gina Signorello.

**THE COURT:** Good morning to all of you. You can stay up at the podium. I put out a notice of questions for the hearing last week. Let's just go through the questions that I have and then at the end I promise I will give you both an opportunity to tell me whatever else that you think I ought to know that wasn't covered in your papers.

So, let's just start with the first question that I had. I won't read the whole question but in essence in Michael Friedman's declaration in support of FaceTec's reply brief, he -- he declared that in February 2022, he had a call with Lowell Ness where he believed Ness to be FaceTec's attorney.

```
 1   true and discussed with Mr. Ness in 2022 during the call with
 2   Mr. Friedman and was the sort of thing that would be discussed
 3   with Mr. Ness.  So, that was the point I wanted to make.
 4           THE COURT:  So, the question I had for Jumio is
 5   question 3 about the potential substantial prejudice.  I
 6   understand that Perkins Coie has put in 2,000 hours to the
 7   defense, which it's hard to tell how much of this is the inter
 8   partes review; but it sounds like the inter partes review is a
 9   significant part of that.
10        Can I count the inter partes review time in terms of
11   assessing the issue of prejudice?  Because I'm not sure the
12   disqualification inquiry here is the same as the
13   disqualification inquiry would be for the IPR process.
14        So, help me understand why Jumio is saying I should
15   consider the IPR petitions in assessing the prejudice on a
16   disqualification for this litigation?
17           MR. KINSEL:  So there are two reasons.  First, FaceTec
18   has asked you to disqualify us with respect to the IPRs; okay.
19   That's the remedy they have asked for.
20        Now, I think as a matter of law that's a non-starter.  I
21   don't see how the Court would have jurisdiction to disqualify
22   us before an administrative board of the Patent Office.
23        Nevertheless, that's the remedy that they have asked for.
24   And so, from that perspective, it is certainly relevant; but
25   even if you don't consider that, it's still relevant because
```

1   these are the choices that Jumio made.  This is an integrated
2   defense; right.
3       So, in order to put together IPRs, there are things that
4   you have to do.  One of them is you have to learn all about
5   your client's product.  You have to invest substantially in
6   understanding how the client's products work.  And then you
7   make choices about prior art to offer and interpretations to
8   make and 112 positions to either take or not take depending on
9   how you want to approach the IPR.  And all of these issues are
10  inner related to this case.
11      So, let me give you a more specific example.  FaceTec says
12  that the IPRs won't be instituted.  We obviously disagree; but
13  if they are right, this case goes on or at least it is not
14  stayed pending the IPRs.
15      And if that's the case, the choices that we made in
16  identifying prior art, identifying claim construction
17  positions, understanding Jumio's products, all of that is lost
18  if we are disqualified.
19      And so, the prejudice is real and substantial.  This
20  isn't -- these IPRs aren't some sort of collateral unrelated
21  litigation; right.  This isn't assuming there are some other
22  patents or anything like that.  This is part of an
23  integration -- integrated defense to this case.
24      And so, once -- if the Court were to disqualify us, the
25  information, the ability to coordinate with replacement counsel

1   for example, would all be lost and so, all of that would be
2   lost to Jumio.  So, the IPR fees are directly relevant.  They
3   are relevant to the prejudice that Jumio would suffer if this
4   Court were to disqualify the firm.
5       And it's substantial and real.  And, you know, the reason
6   we offered all of this is because --
7           **THE COURT:**  Wait.  Let me just make sure I understand
8   it.
9           **MR. KINSEL:**  Sure.
10          **THE COURT:**  Basically the argument is if FaceTec had
11  made this motion much earlier, then -- then potentially Jumio
12  could have retained a counsel who could have done both the IPR
13  and this litigation, which are obviously intertwined and
14  require duplication of the same work if you were to have two
15  different counsel.
16          **MR. KINSEL:**  Right.
17          **THE COURT:**  So, Jumio could have decided to pick a
18  different law firm that could have done both of those things;
19  and it wouldn't be having to pay twice for this, which is what
20  it will have to do now because of the delay in bringing the
21  disqualification --
22          **MR. KINSEL:**  That's exactly correct.  So, the --
23  the -- we weren't retained until approximately June or so.  We
24  made our first appearance, I believe, in August.  And it wasn't
25  until four months later that they filed the disqualification

1   motion, a couple of days before Thanksgiving.
2       And if they had raised this -- I called Mr. Dilger I think
3   the very same day I appeared.  And if they had raised this
4   issue then, then the client could have made a different
5   decision.  The client could have retained somebody else.  By
6   that point we hadn't drafted the IPRs.  We hadn't identified
7   the prior art.  There was a lot of work that could have been
8   done by somebody else, and the client would have been better
9   off if we get disqualified retaining somebody else to do that.
10  But FaceTec waited.  They said nothing.  I talked to their
11  general counsel.  He said nothing.
12      You know, so all of this time was spent -- and we didn't
13  have a lot of time to prepare those IPRs, so we drafted them as
14  quickly as we possibly could; the reason being -- as the Court
15  will recall in our original status conference, I think the
16  Court warned us -- that if we sleep on our IPR rights, the
17  Court is going to be disinclined to stay.
18      So, when all that happens, we step on the gas.  We start
19  our IPR work, and then we eventually get them filed in
20  November.  And all of that work that now is going to have to be
21  duplicated if we are disqualified could have been done by other
22  counsel.  And so, it would have been a different choice that
23  the client could have made had they raised this issue promptly.
24  And they didn't.
25           **THE COURT:**  Let me hear from FaceTec on why you

1   waited.
2       **MR. DILGER:**  Certainly.  Thank you, Your Honor.
3       A couple things; first, this appears to be -- obviously,
4   they are talking about the delay, I think, of
5   three-and-a-half -- three-and-a-half months that that caused
6   prejudice because they spent work during that time.
7       First off, it ignores that apparently -- and Perkins has
8   indicated they knew about the conflict and presumably told
9   Jumio about the conflict.  It is pursuant to their ethical
10  obligations.  They didn't tell FaceTec, which they should have.
11  They presumably told Jumio.  So, Jumio knew what they were
12  getting.  So, I think that plays into whether the prejudice
13  would be considered extreme.
14      But what's more problematic here is that Jumio does not
15  sort of explain what this 2,000 hours mean -- what portion of
16  this 2,000 hours was on the -- on the IPRs, what portion was on
17  the case, what portion was done before they even appeared in
18  the case.
19      Perhaps most critically, Counsel just keeps saying that
20  that stuff is lost.  I don't know that to be true at all, and
21  there is no explanation of how it is lost.  The IPR
22  petitions -- I don't know how to unring the bell here.  The IPR
23  petitions are on file.  The infringement contentions are on
24  file.  I don't know what to do about that from a remedy
25  standpoint from FaceTec's perception, but there has been no

1  explanation of why that's all lost; and I think you would need
2  that and explain -- we spent a bunch of time.  You would have
3  to explain when did you spend the time, when --
4        **THE COURT:**  Well, the argument is if they have to get
5  new counsel, then that counsel has to start from zero and learn
6  all of that --
7        **MR. DILGER:**  My response --
8        **THE COURT:**  -- because they can't use the information
9  that Perkins developed.
10        **MR. DILGER:**  Publicly file it.  I don't know how to
11  unring that bell.  I think you are right; that their work
12  product -- I don't know how -- how do you scrub the record of
13  an IPR that is a public petition now?  It's kind of like trying
14  to get, you know, your college frat pictures off of the
15  internet.
16        **THE COURT:**  I see what you are saying.  The final
17  product is out there.  And so, they would have a head start at
18  least --
19        **MR. DILGER:**  You could scrub it but I don't know how
20  to do that.
21        **THE COURT:**  They would have a head start at least from
22  that, but they wouldn't have all of the other background that
23  maybe Perkins has developed that is not reflected in the final
24  work product but that --
25        **MR. DILGER:**  I don't know what that would be; but,

1  yeah, I mean, you are right.  But what amount of it is just
2  drafting the petition?  I mean, I don't know -- 2,000 hours is
3  a lot of time.  I assume -- when was it expended?  How is
4  that -- how should you apportion between, you know, oh, had
5  they told us in the first month, maybe -- when I talked to
6  Mr. Kinsel the first time, I obviously didn't know about this
7  conflict.  You know, they weren't warning me -- my client
8  wasn't thinking that Perkins is going to show up.  You should
9  be aware that Perkins is going to show up.
10           **THE COURT:**  Help me understand why you were waiting
11  that three-and-a-half months.
12           **MR. DILGER:**  We were investigating it.  We started
13  digging into it.  The client started sending me stuff; like,
14  hey, see what you can find in there.  And there was some issues
15  with his e-mails as well.  And as soon as he started sending,
16  it was like, oh, man, this is starting to look weird.
17      And honestly, when I first looked at it, when I first
18  heard about, oh, they had done some corporate work, I was like,
19  oh, yeah, I don't know if it is going to go anywhere.  And by
20  the time I started getting all the things, and I didn't even --
21  he wasn't even able to find this slide deck until probably two
22  weeks before he filed the actual motion; and we had already
23  kind of notified them that we were going to move for
24  disqualification.  This is one of the last things I found
25  because, you know, we are looking at records that are nine

1  years old and, you know, computers that are gone.  So, that
2  definitely did slow down our process a bit.
3       **THE COURT:**  So, you are saying the investigation took
4  a long time because you -- I mean, it seems like your client
5  would probably know that Perkins had worked for them and in
6  what capacity but the corroborating documents took a long time
7  or what is it that --
8       **MR. DILGER:**  Initially, one of the first questions we
9  had was whether we wanted to move forward with this case.  So,
10 our first focus was when we first talked with Mr. Kinsel was
11 whether Jumio was the real problem here.  And the initial
12 discussions, you will recall we actually moved to dismiss the
13 case.
14      So, we were -- I think that was the initial focus.  Then
15 once we -- probably about a month in, we started looking into
16 it and involving ethics counsel and getting through it.  So,
17 that was part of what took that three-month time period.
18      Then you have got to draft the actual motion itself and do
19 all of that good stuff.  It's a lot of work.  And, candidly, I
20 have never moved for a disqualification or had a
21 disqualification moved for.  It's an ugly motion.  It is not
22 taken lightly.
23      **THE COURT:**  I actually think we have covered what I
24 wanted to cover for 4 and 5.  I will just give you-all an
25 opportunity to tell me anything else that you think is

1    **THE COURT:** I know we have had a long argument. I
2 appreciate the argument and the briefing on this. I'm going to
3 take the matter under submission and issue a written order.
4 Thank you.
5    **MR. DILGER:** Thank you, Your Honor.
6    **MR. KINSEL:** Thank you, Your Honor.
7    **THE COURT:** Be well.
8        (Proceedings adjourned at 11:39 a.m.)
9                ---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    February 15, 2025

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter